754 A.2d 1018

Andrew Charles **HARRYMAN**

v.

**STATE of Maryland.**

**No. 1, Sept. Term, 1999.**

Court of Appeals of Maryland.

June 29, 2000.

494

Julia Doyle Bernhardt, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (Retired, Specially Assigned), JJ.

ELDRIDGE, Judge.

■■ This case presents the issue of whether Maryland Rule 9–207 permits a circuit court judge to refer to a master a prosecution for criminal contempt based upon the defendant's failure to pay child support. We shall hold that it does not.

## I.

As the basis for the referral of this criminal case to a master was Rule 9–207, we shall at the outset set forth the pertinent provisions of that rule:

"**Rule 9–207. Referral of matters to masters.**

"**a. Referral.** (1) As of course. In a court having a master appointed for the purpose, unless the court directs otherwise in a specific case, the clerk shall refer the following matters arising under this Chapter ["Divorce, Annulment and Alimony"] to the master as of course when a hearing has been requested or is required by law:

(A) Uncontested divorce, annulment, or alimony actions;

(B) Alimony pendente lite;

(C) Support of child pendente lite;

(D) Support of dependents;

(E) Preliminary or pendente lite possession or use of the family home or family-use personal property;

\* \* \*

(G) Contempt by reason of noncompliance with an order or judgment relating to the payment of ... support ...

following service of a show cause order upon the person alleged to be in contempt;

\* \* \*

"(2) By order. On motion of any party or on its own initiative, the court, by order, may refer to a master any other matter or issue arising under this Chapter that is not triable of right before a jury.

\* \* \*

"e. **Transcript.** A transcript shall be ordered and filed as required by Rule 2–541(h)(2).

"f. **Entry of orders.**

\* \* \*

"(3) Contempt orders. On the recommendation by the master that an individual be found in contempt, the court may hold a hearing and direct the entry of an order at any time."

Rule 2–541, to which Rule 9–207 makes several references, is the rule which governs the role of masters in civil cases generally, with the exception of juvenile causes. This rule provides, in relevant part, as follows:

"(a) **Appointment—Compensation.**

\* \* \*

"(3) Officer of the court. A master serves at the pleasure of the appointing court and is an officer of the court in which the referred matter is pending.

"(b) **Referral of cases.** (1) Referral of domestic relations matters to a master as of course shall be in accordance with Rule 9–207.

\* \* \*

"(e) **Further proceedings.** (1) Domestic relations cases. In cases referred to a master pursuant to Rule 9–207, the procedures and requirements governing the master's report, the filing of exceptions, and further judicial proceedings shall be as set forth in that Rule.

\* \* \*

"(h) **Exceptions.**

\* \* \*

"(2) Transcript .... a party who has filed exceptions shall cause to be prepared and transmitted to the court a transcript of so much of the testimony as is necessary to rule on the exceptions. The transcript shall be ordered at the time the exceptions are filed.... The court may dismiss the exceptions of a party who has not complied with this section.

\* \* \*

"(j) **Costs.** ... The costs of any transcript may be included in the costs of the action and assessed among the parties as the court may direct."

Turning to the facts of this case, on October 1, 1997, Andrew Charles Harryman was ordered by the Circuit Court for Howard County to pay $336.19 per month for child support accruing from June 1997, and was further ordered to pay an additional $39 per month against arrears of $4,511.09. On March 5, 1998, the State's Attorney for Howard County filed a petition in the Circuit Court for Howard County charging Harryman with criminal contempt for failure to comply with the child support order. On the same day, a judge of the Circuit Court issued a show cause order which provided, *inter alia*, "that the trial of this Petition to Cite for Criminal Contempt be conducted before the Master in Chancery in accordance with the provisions of Rule 9–207(a)(1)(G)." In

addition, the Circuit Court ordered that Harryman "appear before the Master in Chancery, on the date set by the Court for the trial of this matter, . . . and then and there show cause pursuant to the provisions of Rules 15–205 and 15–207, . . . why he should not be adjudged guilty of, and punished for, criminal contempt of this Court. . . ."[1] Moreover, the order stated that "any sentence of incarceration imposed as a result of any contempt finding under this Show Cause Order shall be limited to no more than 180 days. . . ."[2]

---

1. Rule 15–205 provides, in relevant part, as follows:

"(a) **Separate action.** A proceeding for constructive criminal contempt shall be docketed as a separate criminal action. It shall not be included in any action in which the alleged contempt occurred."

Rule 15–207 states, in relevant part, as follows:

"**Rule 15–207. Constructive contempt; further proceedings.**

\* \* \*

"(d) **Disposition—Generally.** (1) Applicability. This section applies to all proceedings for contempt other than proceedings for constructive civil contempt based on an alleged failure to pay spousal or child support.

"(2) Order. When a court or jury makes a finding of contempt, the court shall issue a written order that specifies the sanction imposed for the contempt. In the case of a civil contempt, the order shall specify how the contempt may be purged. In the case of a criminal contempt, if the sanction is incarceration, the order shall specify a determinate term and any condition under which the sanction may be suspended, modified, revoked, or terminated.

"(e) **Constructive civil contempt—Support enforcement action.** (1) Applicability. This section applies to proceedings for constructive civil contempt based on an alleged failure to pay spousal or child support. . . .

\* \* \*

"(4) Order. Upon a finding of constructive civil contempt for failure to pay spousal or child support, the court shall issue a written order that specifies (A) the amount of the arrearage for which enforcement by contempt is not barred by limitations, (B) any sanction imposed for the contempt, and (C) how the contempt may be purged. If the contemnor does not have the present ability to purge the contempt, the order may include directions that the contemnor make specified payments on the arrearage at future times and perform specified acts to enable the contemnor to comply with the direction to make payments."

2. The Circuit Court's order was issued before this Court's decision in *Dorsey v. State*, 356 Md. 324, 345–348, 739 A.2d 41, 52–54 (1999), in which we held that a defendant in a constructive criminal contempt

On August 26, 1998, the Circuit Court issued a second show cause order for criminal contempt, reiterating the previous order but adding that Harryman had accumulated an arrearage of $5,855.85 in child support as of February 1998. Harryman was further ordered to appear before the master in October 1998 "to be advised of his right to counsel and of the date on which he will show cause ... why the relief prayed in the Petition to Cite for Contempt should not be granted...."

At the October 1998 proceeding, the master informed Harryman of his right to counsel and told him to appear for a "merits hearing" in December 1998. At the "merits hearing," Harryman was not represented by counsel. When the master questioned him as to why he was not represented by counsel, Harryman explained that he had tried to obtain the services of three private attorneys but could not afford them because he had "[t]oo many bills." The master stated: "I'm not going to find that you are indigent, and I am going to find that your failure to retain counsel constitutes a waiver by inaction."[3]

The master next informed Harryman that he was facing "a criminal contempt charge" and asked him how he would plead. Harryman pled not guilty, and testified that approximately $86 for child support had been taken out of his pay check every week of the one year he had worked at his current job. As proof of this assertion, he offered his earnings statement for the period ending November 19, 1998. On cross-examination, the State asked Harryman why, if child support money had been taken out each week for the entire year, the earnings statement showed that only $1501.02 had been taken out as of November 19. Harryman explained that his employer had changed to a new checking system and that the earnings

---

prosecution in a circuit court has a right to a jury trial regardless of the sentence actually imposed. *See also Ashford v. State,* 358 Md. 552, 566–567, 750 A.2d 35, 42–43 (2000).

**3.** Recently in *Thrower v. State ex rel. Bureau of Support Enforcement,* 358 Md. 146, 149–151 n. 2, 747 A.2d 634, 636–637 n. 2 (2000), we noted and questioned the "policy" of the Public Defender's Office of not representing indigents in contempt proceedings before masters.

statement reflected only the child support taken out since the new checks had been in use. Harryman testified that more money had been taken out over the course of the year but admitted that he did not have any proof with him. In its closing argument, the State contended that the record showed that Harryman failed to prove that he had made any child support payments between the October 1997 order to pay child support and the March 1998 order to show cause.

The master "recommend[ed] a finding of guilty" on the basis that there was a "window of non-payment" between the October 1997 order and February 1998 which overlapped with the period of Harryman's employment. In its sentencing argument, the State requested that Harryman be sentenced to 180 days' incarceration, with all but 30 days suspended and the 30 days to be served on work release. The master then informed Harryman that "this is your opportunity for allocution. That is, your opportunity to bring to my attention anything in particular that you wish me to consider with my regard as to sentencing." Harryman stated only that he was working presently and would ensure that child support payments were taken out of his pay check.

The master noted that, as Harryman's arrearage had increased to $7,582.86 as of late November 1998, there was "still . . . a substantial deficiency in the required payments," even if she took into account the $1501.02 taken out from Harryman's recent pay checks. Moreover, she stated that

"in terms of sentencing—recommendation as to sentencing, the deficiency is notable in that the defendant was served with the matter—this matter, August 28, 1998, so it appears that until the criminal contempt proceeding is served and actually the hearing becomes imminent, there are no payments being made. Then again, with Mr. Harryman's testimony that he has been employed . . . throughout the course of the year, there is really no explanation for this."

The master informed Harryman that she would recommend a sentence of 180 days' incarceration in the Howard County Detention Center, with all but 45 days suspended and with

those 45 days to be served on work release. The remaining 135 days of the sentence would be suspended in favor of 48 months' unsupervised probation provided that, *inter alia,* Harryman make monthly child support payments, including payments to make up for his arrearage. In addition, the master explained to Harryman that he could "purge" as follows:

"I'll recommend a purge of thirty-seven hundred fifty dollars—you're actually thirty-six hundred seventeen dollars and seventeen cents delinquent at the point Mr. Harryman. That is what should have been paid roughly since this order was established, that has not been paid. You have no right to purge in a criminal contempt case, so I actually don't have to match the purge up with what is delinquent or what I think you may have the ability to pay like we would have to do in a civil contempt case—just an opportunity to buy your way out of jail. And that's the amount it's going to cost you. . . . If you pay the thirty-seven fifty, you are released from serving the thir—the forty-five days."

The master summarized her findings of fact and recommendations in a written "Report and Recommendation" issued on December 3, 1998.

Harryman timely filed an exception to the master's recommendation, asserting that "I have recently found my other pay stubs to prove my boss has been taking out my child support since April 1998." Harryman also requested a transcript of the "merits hearing" as required by Rules 9–207e and 2–541(h)(2). A month later, the State filed a motion to dismiss the exception on the ground that Harryman had failed to pay the court reporter a deposit for the transcript in violation of "Judge Kane's memo of July 10, 1995, for the processing of exceptions. . . ."[4] Judge Kane then granted the State's mo-

---

4. Although the July 10, 1995, "memo" stated that a "transcript has not truly been 'ordered' until the deposit has been paid" and that "[i]f there is an unreasonable delay in paying the deposit, exceptions may be dismissed," this memorandum did not define the term "unreasonable delay." The record indicates that an undated subsequent memorandum from Judge Kane to the Clerk of the Circuit Court for Howard County amended the July 10, 1995, memorandum as follows: "Effec-

tion to dismiss Harryman's exception. On January 21, 1999, the Circuit Court issued an order adjudicating Harryman guilty of criminal contempt. The order was based entirely on the Master's report and recommendation. In addition, the order stated that any "proceeding arising from a petition to revoke the probation provided" in the order be "referred, pursuant to Maryland Rule of Procedure 2–541, to Elaine Patrick, Master in Chancery, for trial." [5]

Harryman, *pro se,* appealed to the Court of Special Appeals. Subsequently, the Office of Public Defender petitioned this Court on Harryman's behalf to issue a writ of certiorari before any decision by the Court of Special Appeals, to stay the judgment of the Circuit Court for Howard County, and to order Harryman's immediate release from confinement pending appeal. This Court granted the petition and the requested relief. *Harryman v. State,* 353 Md. 268, 725 A.2d 1067 (1999).

## II.

■ Harryman's petition for a writ of certiorari presented the following two questions:

"1. Whether a prosecution for criminal contempt for failure to pay child support can be referred validly to a domestic-relations master.

"2. Whether petitioner was tried for criminal contempt in violation of his right to counsel."

---

tive immediately the term 'unreasonable delay' as used in the July 10, 1995, memorandum will mean 'fifteen days from the date the written master's recommendation is delivered to the parties or their attorneys at the conclusion of the hearing or eighteen days from the date of mailing of the master's recommendation....' "

5. It is unclear to what section of Rule 2–541 the order refers. We note that the Circuit Court's show cause orders had previously stated that Harryman's proceeding was being referred to a master pursuant to Rule 9–207. Perhaps the Circuit Court was referring to Rule 2–541(e) which provides that further judicial proceedings in domestic relations cases are to be governed by Rule 9–207. Rule 9–207, like Rule 2–541, is silent as to a master's purported power to preside over a "trial" arising from a petition to revoke probation for criminal contempt.

The case at bar presents an issue of first impression, namely whether a master, who is not a judicial officer, nevertheless has the authority to preside over a criminal prosecution. As we shall hold that masters are not authorized to preside over criminal prosecutions, including criminal contempt proceedings, we need not reach the second question raised by the petitioner. Moreover, in answering the first question, we need not directly address the serious constitutional issues involved, because the Maryland Rules do not authorize masters to try criminal cases.[6]

Harryman contends that neither Rule 9–207 nor Rule 2–541 explicitly authorize masters to preside over criminal contempt prosecutions, even in a master's limited capacity to report nonbinding findings of fact and conclusions of law, and recommend an order or judgment, subject to the determination of a judge. The State argues, however, that the "plain language" of Rule 9–207(a)(1)(G)

"provides that, as a matter of course, a hearing on contempt by reason of noncompliance with an order relating to, among other things, the payment of child support will be heard by a master. There is no limitation on the type of contempt proceedings a master may hear. . . .

\* \* \*

"if this Court had wanted to restrict the contempt hearings a master can hear to civil contempts, the rule would have stated that masters can hear *civil* contempt proceedings. The failure to so provide indicates the intent to allow masters to hear all contempt proceedings, both civil and criminal." (Respondent's brief at 8, 10).

---

**6.** We decline to reach the constitutional issues in this case in light of " 'the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground.' " *Dorsey v. State, supra,* 356 Md. at 342, 739 A.2d at 51, quoting *Telnikoff v. Matusevitch,* 347 Md. 561, 579 n. 15, 702 A.2d 230, 239 n. 15 (1997). *See also Ashford v. State, supra,* 358 Md. at 561, 750 A.2d at 40, and cases there cited; *Thrower v. Support Enforcement, supra,* 358 Md. at 149 n. 2, 747 A.2d at 636 n. 2, and cases there cited.

Preliminarily, we note that this Court has recently stated, in the context of constructive *civil* contempt proceedings presided over by a master and resulting from the defendants' failure to pay child support, that "whether or not Constitutionally mandated, as a matter of sound judicial policy, incarceration should be ordered only by a judge on a record developed before the judge." *Thrower v. State ex rel. Bureau of Support Enforcement,* 358 Md. 146, 151 n. 2, 747 A.2d 634, 637 n. 2 (2000).[7]

Maryland law concerning the nature of criminal contempt, and the requirements for criminal contempt prosecutions, have recently been discussed in detail by this Court. *See Ashford v. State,* 358 Md. 552, 750 A.2d 35 (2000); *Dorsey v. State,* 356 Md. 324, 342-344, 739 A.2d 41, 51–52 (1999). In sum, a prosecution for constructive criminal contempt resembles other criminal prosecutions under Maryland law. For example, unlike in a civil contempt proceeding, in a criminal contempt prosecution (*Dorsey,* 356 Md. at 343, 739 A.2d at 51, quoting *State v. Roll and Scholl,* 267 Md. 714, 731, 298 A.2d 867, 877 (1973)),

"'additional criminal safeguards are available to [the accused]. The burden of proof is increased, the accused cannot be compelled to testify against himself, he cannot be put in double jeopardy, and, except when a contempt may be dealt with summarily [*i.e.,* direct criminal contempt], the panoply of fundamental due process rights comes into play.'"

Moreover, Rules 15–205 and 15–208 "largely [treat] constructive criminal contempt like other criminal actions with regard to the initiation of prosecution, waiver of counsel, waiver of jury trial, and bail." *Dorsey,* 356 Md. at 343–344, 739 A.2d at

---

7. In *Thrower v. Support Enforcement, supra,* 358 Md. at 151 n. 2, 747 A.2d at 637 n. 2, we went on to say that the "authority to refer such cases to masters with court review on the record made before the master ... *in its present form,* ... has outlived its usefulness," and we announced that a proposal to amend Rule 9–207 accordingly was currently pending before this Court. We recently adopted the proposal and amended Rule 9–207.

52. In addition, whereas Rule 15–206(a) directs that a "proceeding for constructive civil contempt shall be included in the action in which the alleged contempt occurred," Rule 15–205(a) mandates that a constructive criminal contempt proceeding "shall be docketed as a separate criminal action." *See, supra,* note 1. As in any other criminal prosecution, the burden of proof in a constructive criminal contempt proceeding lies with the State to prove the defendant guilty beyond a reasonable doubt.

■ An examination of the role of masters, as set forth by this Court and the courts of other American jurisdictions, suggests why the State has failed to find a single precedent supporting its argument that a master may preside over a criminal contempt prosecution.[8] In numerous cases, this Court has emphasized that a master is not a judicial officer, and is not vested with any judicial powers under the Maryland Constitution. *See State v. Wiegmann,* 350 Md. 585, 590–600, 714 A.2d 841, 843–848 (1998), and cases there cited.[9] Although the State Constitution does authorize circuit courts to appoint masters as officers of the court, "a master's status as an 'officer of the court' does not confer *judicial* powers upon the master. . . ." *Wiegmann,* 350 Md. at 595, 714 A.2d at 845.[10] Instead, "a master is a ministerial officer" who advises

---

8. The State has not brought to our attention, and we are otherwise not aware of, any criminal prosecution heard by a master in any court in this nation. On the other hand, the Supreme Court of New Hampshire has held that a bill which would vest marital masters with the power to adjudicate and impose penalties for civil contempt, including incarceration, prior to judicial review, would be unconstitutional, as the bill's effect would be "to grant marital masters the authority of judicial officers." *See Opinion of the Justices (Marital Masters' Contempt Powers),* 138 N.H. 425, 428, 640 A.2d 784, 786 (1994).

9. Article IV, § 1, of the Maryland Constitution provides, in relevant part, as follows:
"The Judicial power of this State is vested in a Court of Appeals, such intermediate courts of appeal as the General Assembly may create by law, Circuit Courts, Orphans' Courts, and a District Court."

10. Article IV, § 9, of the Maryland Constitution provides, in relevant part, as follows: "The Judge, or Judges of any Court, may appoint such officers for their respective Courts as may be found necessary."

and assists a judge. *Matter of Anderson*, 272 Md. 85, 106, 321 A.2d 516, 527 (1974), *appeal dismissed*, 419 U.S. 809, 95 S.Ct. 21, 42 L.Ed.2d 35 (1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2399, 44 L.Ed.2d 667 (1975). *See also Swisher v. Brady*, 438 U.S. 204, 98 S.Ct. 2699, 57 L.Ed.2d 705 (1978).

As this Court stated in *Matter of Anderson, supra*, 272 Md. at 101, 321 A.2d at 525, there is "nothing new about the concept of a master." The *Anderson* opinion explained that the office of master in Maryland and other American jurisdictions derived from the assistants to the chancellor in England who had originally been appointed by the king. 272 Md. at 102, 321 A.2d at 525. In Maryland, masters have continued to act as assistants and advisors to the court exclusively in civil cases: "We have pointed out that, under the Maryland Rules applicable to juvenile cases and under the procedure generally where masters are involved, a master hears evidence and then reports his findings of fact and his recommendations to the chancellor." 272 Md. at 106, 321 A.2d at 527. *See also Attorney General v. Johnson*, 282 Md. 274, 288 n. 14, 385 A.2d 57, 65 n. 14 (1978).[11]

██ Our cases have long held that, although a master's " 'report is only advisory, ... the master's findings of fact from the evidence are prima facie correct and they will not be disturbed unless determined to be clearly erroneous.' " *Matter of Anderson, supra*, 272 Md. at 102, 321 A.2d at 525, quoting *Bar Ass'n v. Marshall*, 269 Md. 510, 516, 307 A.2d 677, 680 (1973). The master's "ultimate conclusions and rec-

---

**11.** In the federal court system, masters have also long been used to assist the court. *See, e.g., Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 292, 76 L.Ed. 598, 613 (1932) ("In cases of equity and admiralty, it is historic practice to call to the assistance of the courts, without the consent of the parties, masters, ... to pass upon certain classes of questions, as, for example, to take and state an account or to find the amount of damages."). It is worth noting that Rule 53 of the Federal Rules of Civil Procedure, which governs the use of masters in civil cases, was derived from the rules of equity and admiralty. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2601 (2 d ed.1995). There is no mention of the use of masters in the Federal Rules of Criminal Procedure.

ommendations," however, must be reviewed with an "independent exercise of judgment by the chancellor." *Domingues v. Johnson,* 323 Md. 486, 491–492, 593 A.2d 1133, 1135 (1991). *See also Petrini v. Petrini,* 336 Md. 453, 472, 648 A.2d 1016, 1025 (1994); *Kirchner v. Caughey,* 326 Md. 567, 572, 606 A.2d 257, 260 (1992). In other words, although the judge is the "ultimate trier of fact," the court presumes the master's findings of fact to be correct and the burden of proof to the contrary is on the objecting party. *Matter of Anderson, supra,* 272 Md. at 102, 321 A.2d at 525, quoting *Bar Ass'n v. Marshall, supra,* 269 Md. at 516, 307 A.2d at 680. This presumption in favor of the master's factual findings conflicts markedly with the presumption of innocence guaranteed to a criminal defendant.

It is true that masters have long presided over juvenile delinquency proceedings, and that "certain of the constitutional rights incident to criminal prosecutions apply to juvenile delinquency proceedings," but this Court has repeatedly stressed that, in Maryland, such "proceedings are civil rather than criminal in nature." *In re Darryl D.,* 308 Md. 475, 478, 520 A.2d 712, 713 (1987). *See also In re Victor B.,* 336 Md. 85, 90–94, 646 A.2d 1012, 1014–1016 (1994), and cases there cited. It is precisely because juvenile delinquency proceedings are civil, rather than criminal, in nature that masters may preside over the proceedings, and that juvenile defendants are not afforded the full due process and other constitutional protections afforded criminal defendants. *See, e.g., Swisher v. Brady, supra,* 438 U.S. at 216 n. 14, 98 S.Ct. at 2707 n. 14, 57 L.Ed.2d at 715–716 n. 14 ("It is not usual in a criminal proceeding for the evidence to be presented and recorded in the absence of the one authorized to determine guilt."). *See also* Justice Marshall's dissenting opinion in the same case (438 U.S. at 219–220, 98 S.Ct. at 2708, 57 L.Ed.2d at 717–718):

"Yet the Court reaches a result that it would not countenance were this a criminal prosecution against an adult, for the juvenile defendants here are placed twice in jeopardy just as surely as if an adult defendant, after acquittal in a trial court, were convicted on appeal. In addition to violat-

ing the Double Jeopardy Clause, Maryland's scheme raises serious due process questions because the judge making the final adjudication of guilt has not heard the evidence and may reverse the master's findings of nondelinquency based on the judge's review of a cold record."

Indeed, the Supreme Court has suggested that, even in a civil proceeding, the nature of the case may require that a party be accorded the due process protection of having a judge, rather than a master, hear his or her testimony. In *Holiday v. Johnston*, 313 U.S. 342, 61 S.Ct. 1015, 85 L.Ed. 1392 (1941), the Court held that district court judges had no authority to refer habeas corpus proceedings to masters. The Supreme Court emphasized that, given the special nature of the proceedings, a petitioner's testimony should be heard directly by a judge: "We cannot say that an appraisal of the truth of the prisoner's oral testimony by a master or commissioner is, in light of the purpose and object of the proceeding, the equivalent of the judge's own exercise of the function of the trier of the facts." 313 U.S. at 352, 61 S.Ct. at 1018, 85 L.Ed. at 1397–1398.

■■■ In addition to ignoring the due process protections which must be accorded Harryman and other defendants in constructive criminal contempt prosecutions, the State ignores two other key factors which militate against permitting a master to hear criminal prosecutions. First, as earlier mentioned, while the defendant has no burden of proof in a criminal prosecution, a party taking exceptions to a master's report and recommendations must overcome the presumed correctness of the master's findings of fact. Second, there is a degree of incompatibility between a criminal defendant's right to a jury trial and allowing a master to preside over criminal prosecutions. As previously noted, *supra* n. 2, our recent cases involving constructive criminal contempt prosecutions have established that "under Ch. 298 of the Acts of 1980, which added new Art. 27, § 593A and § 12–401(e), now § 12–401(g) of the Courts and Judicial Proceedings Article ... in any circuit court criminal case ... a defendant is entitled to a

jury trial if the offense charged is subject to imprisonment." *Ashford v. State, supra,* 358 Md. at 566–567, 750 A.2d at 42–43. *See also Dorsey v. State, supra,* 356 Md. at 345–348, 739 A.2d at 52–54. If, as the State urges, this Court were to construe Rule 9–207(a)(1)(G) as authorizing masters to hear constructive criminal as well as constructive civil contempt proceedings, this section of the rule would appear to conflict with the statutes setting forth the right to a jury trial in any circuit court criminal case in which a penalty of imprisonment could be imposed.

A further problem raised by the State's interpretation of Rule 9–207 is that application of the rule, as construed by the State, would raise serious constitutional questions regarding due process, the burden of proof, and the right to a jury trial in a criminal prosecution. These questions are not raised if the rule is construed to apply only to civil contempt proceedings. On numerous occasions, this Court has "emphasized that ' "if a legislative act is susceptible of two reasonable interpretations, one of which would not involve a decision as to the constitutionality of the act while the other would, the construction which avoids the determination of constitutionality is to be preferred." ' " *Schochet v. State,* 320 Md. 714, 725, 580 A.2d 176, 181 (1990), quoting *G. Heileman Brewing v. Stroh Brewery,* 308 Md. 746, 763–764, 521 A.2d 1225, 1234 (1987), quoting *Maryland State Board of Barber Examiners v. Kuhn,* 270 Md. 496, 505, 312 A.2d 216, 221 (1973). In other words, an interpretation which raises doubts as to a legislative enactment's constitutionality should be avoided if the language of the act permits. *See Schochet v. State, supra,* 320 Md. at 725–726, 580 A.2d at 181, and cases there cited. *See also Tidewater/Havre de Grace v. Mayor of Havre de Grace,* 337 Md. 338, 352, 653 A.2d 468, 475–476 (1995), and cases there cited; *Curran v. Price,* 334 Md. 149, 172, 638 A.2d 93, 104–105 (1994); *St. George Church v. Aggarwal,* 326 Md. 90, 102, 603 A.2d 484, 490 (1992). As the language of Rule 9–207 does not compel us to construe it in

such a way as to pose substantial constitutional questions, we should refrain from doing so, and interpret the rule as having application only to civil contempt proceedings.

 Finally, the structure and history of the rules regarding the role of masters in domestic relations proceedings suggest that a master's authority to hear contempt proceedings is limited to domestic relations and other civil cases, and does not encompass criminal contempt prosecutions. The placement of Rules 2–541 and 9–207 in the titles applying, respectively, to civil procedure in the circuit courts and family law actions, supports the position that the role of masters is limited to civil cases.[12] Both Rules 2–541 and 9–207 derive from former Rule 596, which was amended in 1980, effective 1981, to establish a statewide rule pertaining to the use of masters in equity cases, with the exception of juvenile causes. Subsection c 6 of Rule 596, which was the predecessor of Rule 9–207(a)(1)(G), provided for referral to masters when "a hearing is requested" regarding "[c]ontempt by reason of noncompliance with a decree or order relating to ... the payment of alimony or support ... following service of a show cause order upon ... the person allegedly in contempt." In 1991, the Rules Committee recommended that this Court "separate, for special self-contained treatment, the role of masters in domestic relations cases," as "the nature of domestic relations cases made them sufficiently distinct from the other kinds of matters that are referred to masters as to justify special treatment." Court of Appeals Standing Committee on Rules

---

12. In relevant part, Rule 1–101 provides as follows:
 "**Rule 1–101. Applicability.**
 \* \* \*
 "(b) **Title 2.** Title 2 applies to civil matters in the circuit courts, except for Juvenile Causes under Title 11 of these Rules and except as otherwise specifically provided or necessarily implied.
 \* \* \*
 "(i) **Title 9.** Title 9 applies to adoptions, guardianships with the right to consent to adoption, and proceedings related to divorce, annulment, alimony, child support, and child custody and visitation."

of Practice and Procedure, *One Hundred Fifteenth Report* (Maryland Register, March 22, 1991, at 675). To accomplish this goal, the Rules Committee proposed amendments to Rule 2–541 (which had succeeded Rule 596) and the adoption of new Rule S74A (the predecessor to 9–207), which "collects, directly or by reference, all the provisions relating to the role of masters in domestic relations actions." *Ibid.* The new rule, as well as the related amendments to 2–541, was adopted by this Court effective July 1, 1991, thus indicating an intent that what is now Rule 9–207 govern the role of masters in domestic relations proceedings. There is no indication of an intent that masters, to whom domestic relations cases are referred, also be empowered to preside over separate criminal contempt prosecutions.

In *State v. Wiegmann, supra,* 350 Md. at 596–598, 714 A.2d at 846–847, we recited the history of former Rule 596 in detail. As documented in *Wiegmann,* the Rules Committee, in debating the amendments to Rule 596, assumed that a master's authority to preside over contempt proceedings was limited by a master's jurisdiction over civil matters, and, therefore, did not extend to separate criminal prosecutions. For example, although one Committee member argued that masters should have no jurisdiction whatsoever in contempt matters, he acknowledged that " 'the impact of deleting contempt from a master's jurisdiction will be tremendous, as it will throw back many cases onto judges, and will only delay *civil cases* further.' " *State v. Wiegmann, supra,* 350 Md. at 597–598, 714 A.2d at 847, quoting *Wiegmann v. State, supra,* 118 Md.App. at 343, 702 A.2d at 941. (Emphasis supplied).

To reiterate, a constructive criminal contempt prosecution, unlike a constructive civil contempt proceeding, "shall not be included in any action in which the alleged contempt occurred," but "shall be docketed as a separate criminal action." *See* Rule 15–205(a). Thus, although a constructive criminal contempt prosecution may result from a refusal to obey a court order to pay child support, the prosecution itself

is not a domestic relations or civil case, and is not included within a master's sphere of authority.[13] The plain language of Rule 9–207 need not specify that masters governed by the rule may hear only civil, and not criminal, contempt cases because such masters have authority only to preside over domestic relations proceedings.

For the foregoing reasons, the Circuit Court for Howard County had no authority to refer Harryman's constructive

---

**13.** Although we need not reach the issue of whether Harryman had waived his right to counsel by inaction, additional evidence that the Maryland Rules do not authorize masters to try criminal cases may be found in the rules pertaining to waiver of counsel in criminal prosecutions. Rule 15–205(e) provides as follows: "**Waiver of counsel.** The provisions of Rule 4–215 apply to constructive criminal contempt proceedings." Rule 4–215 provides, in relevant part, as follows (emphasis supplied):

"(a) **First appearance in court without counsel.** At the defendant's first appearance in court without counsel, or when the defendant appears in the District Court without counsel, demands a jury trial, *and the record does not disclose prior compliance with this section by a judge,* the court shall [advise the defendant of the right to counsel and related matters]

\* \* \*

"(5) If trial is to be conducted on a subsequent date, advise the defendant that if the defendant appears for trial without counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel."

\* \* \*

"(d) **Waiver by inaction—Circuit court.** If a defendant appears in circuit court without counsel on the date set for hearing or trial, indicates a desire to have counsel, and the record shows compliance with section (a) of this Rule, . . . the court shall permit the defendant to explain the appearance without counsel. . . . If the court finds that there is no meritorious reason for the defendant's appearance without counsel, the court may determine that the defendant has waived counsel by failing or refusing to obtain counsel and may proceed with the hearing or trial."

The State argues that, as a master is an officer of the circuit court, the directives in Rule 4–215 as to what a "court" "shall" or "may" do express an intent to empower masters "to conduct the colloquy mandated under Rule 4–215(a) and to find waiver by inaction under Rule 4–215(d)." (Respondent's brief at 36). The State overlooks, however, the explicit language in Rule 4–215(a) which refers to prior compliance with "this section by a judge." This phrase makes clear that the procedures and responsibilities of "the court" regarding a criminal defendant's waiver of counsel as set forth in Rule 4–215 are to be carried out by a judge, and not a master who is not a *judicial* officer.

criminal contempt prosecution to a master pursuant to Rule 9–207(a)(1)(G).

*JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT IN-CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY HOWARD COUNTY.*