790 A.2d 1

**William Robert O'BRIEN**

v.

**Colleen Victoria O'BRIEN.**

**No. 30, Sept. Term, 2001.**

Court of Appeals of Maryland.

Feb. 4, 2002.

William N. Porter (Charles E. Chlan & Assoc., LLC, on brief), Columbia, for petitioner.

Louis Fireison (Michael A. Coogen, Jr. of Louis Fireison & Associates, P.A., on brief), Bethesda, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

We granted *certiorari* to determine whether the Court of Special Appeals was correct in holding that respondent, Colleen O'Brien, who assumed actual care and custody of her minor sister, Fiona, following the death of their mother, may enforce an existing child support order entered against their father without first having been appointed as Fiona's guardian. *See O'Brien v. O'Brien,* 136 Md.App. 497, 766 A.2d 211 (2001). Unfortunately, we shall be unable to decide that issue, as no judgment has been entered in the case.

When William and Gabriele O'Brien were divorced in 1988, they had three children—Molly, who was 16, Colleen, who was 15, and Fiona, who was only seven. The judgment of divorce incorporated a property settlement agreement under which the O'Briens agreed that they would have joint legal custody of Molly and Colleen, that Molly would live with her mother and Colleen would live with her father, and that the mother, Gabriele, would have sole legal and physical custody of Fiona. The initial judgment required William to pay child support to Gabriele for Molly and Fiona in the amount of $250/month, each.

In June, 1991, after both Molly and Colleen had turned 18, the support order was modified to require William to pay $514/month for the support of Fiona. The modified support order took into account a provision in the property settlement

agreement that each party would pay one-half of the private school tuition for the children. The annual tuition payment at the time was determined to be $2,942, of which William's share was $1,471, or $123/month. That amount was added to his base monthly child support obligation of $391, which produced the gross obligation of $514. Payment of that support was enforced through an earnings withholding order that directed William's employer to deduct the requisite amount from William's salary and make the payment to Gabriele through the Child Support Enforcement Division of the Circuit Court (CSED).[1]

Gabriele died on March 13, 1996. On March 26, William notified CSED of Gabriele's death and advised that "[s]ince I will now be the sole supporter of [Fiona], my daughter, I request that the garnishment of my salary cease." Obviously assuming the truth of that statement, CSED responded on April 29, 1996, with a Notice of Closing that stated:

> "The Child Support Enforcement Division has been advised of the Plaintiff's death on March 31, 1996.[2] Consequently, ongoing child support is terminated effective said date. There are no arrearages owed. This case is CLOSED on the Child Support Enforcement Division's computer system and no further action will be taken. Defendant's employer shall no longer deduct child support from his wages, effective immediately."

Based on that response, William ceased paying any direct support for Fiona. He made no effort to have the existing court order modified or vacated, however. Nor did he assume actual custody of the child or provide for her food, clothing,

---

**1.** William had a history of nonpayment. When the judgment of divorce was entered, he was $6,100 in arrears with respect to *pendente lite* support, and, as a result, the court denied his motion to stay enforcement of the earnings withholding order. When the amended order was entered in June, 1991, he was found to be $2,250 in arrears.

**2.** There appears to be a discrepancy regarding the date of Gabriele's death. The record and the briefs state that she died on March 13. CSED apparently transposed the numbers to March 31.

shelter, or other daily living expenses, as he had represented to CSED he would do.

At the time of her mother's death, Colleen was just completing her last year of college in New York. She returned home for about three weeks to get "everything set up," and, following her graduation two months later, she returned permanently, moved into the home where Fiona and Molly were living, and assumed responsibility for her younger sister.[3] Fiona was enrolled at the time in the National Cathedral School. William, who was already responsible for half of the tuition, $123/month of which was included in the 1991 child support order, arranged for a package of tuition support and assumed responsibility for an average of $364/month of the tuition. He kept Fiona insured under his health insurance policy and said that he occasionally gave her "car fare" of $15 to $20 when he saw her, but, as noted, he made no other contribution to her support.

Colleen applied for social security benefits for Fiona and, in May or June of 1996, began to receive $500/month. She testified that she paid for all of Fiona's basic living expenses, including food and clothing, and that, despite several oral requests by her, William never contributed anything toward those expenses. In her testimony given before a domestic relations master, Colleen estimated Fiona's expenses as $200/ month for food, $150 to $200/month for utilities, $100 for transportation (representing a three-way split of the payment

---

3. Colleen testified that the home and an adjacent property were owned by her grandmother and were eventually placed in trust for her and her two sisters. Molly remained in the home until 1998 when, under disputed circumstances, she moved. During the period at issue, the sisters rented out the adjacent property and one room in the home they occupied. They received approximately $1,275/month in rent, but Colleen testified that all of that money was used for taxes, insurance, and other expenses on the properties. She added that, because the home they occupied was in such poor condition-the roof was leaking and they were down to one working bathroom-they placed a mortgage on the home in August, 1998, in order to make repairs, and that the monthly mortgage payment, commencing in September, 1998, was $1,300.

due on Gabriele's car), $250/month for clothing and incidentals, and $200/month for spending money.

Colleen took no steps to have herself appointed as Fiona's legal guardian. She said that she discussed that prospect with her father and that he asked her not to make such an effort— that he would resist it. She said that she asked her father on a number of occasions to provide assistance and that he refused, claiming that "things were tight." By the winter of 1999, while contemplating how to defray Fiona's upcoming college expenses, she and Fiona came to the conclusion that it was unfair of their father not to have provided support and that, if they could recover that support, it could be used for Fiona's college expenses.[4] On February 12, 1999, three months shy of Fiona's 18th birthday, Colleen filed a motion to intervene in the divorce proceeding. She alleged in her motion that Fiona had been in her care and custody since March 13, 1996, that she had assumed responsibility for her sister's care, support, and maintenance, that William, though gainfully employed and subject to an existing order of child support, had refused to provide any support to Fiona since March, 1996, and that Colleen was a proper and fit person to have custody of Fiona.

On March 24, 1999, the court entered an order granting the intervention, whereupon Colleen filed a motion seeking (1) custody of Fiona, (2) an order holding William in contempt for failure to pay the court-ordered child support, (3) modification of the child support, (4) a judgment for arrearages, and (5) counsel fees. William responded with a motion to vacate the order granting intervention on the ground that child support had been terminated in March, 1996, and that it was inappro-

---

4. In May, 1999, on the occasion of Fiona's graduation from high school, Colleen wrote to her father, complaining about his refusal to contribute. In that letter, she asked, "How did you, that day 3 years ago, manage to call and cancel child support, knowing what a financial burden it would put on me … [?]" She added that it was unfair for Fiona to face having to work two jobs while taking a full course-load and for Colleen to have to continue to pay her share of the rent because he did not take his responsibilities seriously. Colleen never received a response.

priate for Colleen to intervene in a case that had been closed for three years. As additional relief, he asked that *he* be awarded counsel fees. In May, 1999, the court denied the motion to vacate and, in due course, the matter was set for hearing before a domestic relations master, at which the evidence summarized above was presented.

In her report, the master rejected William's contention that, because Colleen was never appointed Fiona's guardian, she had no standing to bring the request for child support. Citing *Robinson v. State*, 68 Md. 617, 13 A. 378 (1888), the master concluded that neither legal custody nor guardianship was a prerequisite to an award of child support to the *de facto* custodian of a minor child. She also determined that an existing order of child support is not automatically terminated upon the death of the payee but imposes a continuing obligation until the order is modified. From those conclusions, and upon the evidence presented, the master found that William was obligated under the 1991 order to pay $514/month. She allowed him a credit for the total tuition he had paid during the 38 month period, in the amount of $13,850, but disallowed the occasional cash gifts—the "car fare"—and found a net arrearage of $5,682, which she recommended be entered as a judgment. She recommended, in addition, that William contribute $2,500 toward Colleen's counsel fees.

William filed four exceptions to the master's report—that (1) the decision to "grant an award of child support" in favor of Colleen for a period of time prior to the date of her motion to intervene was clearly erroneous "in that [Colleen] lacked the proper standing since Maryland Law allows child support to be awarded only back to the date of filing of the request for same," (2) the master erred in finding an entitlement to child support without finding that Colleen "provided the actual support of the minor," (3) she abused her discretion in "failing to apply equitable principles of fairness and laches," and (4) she was clearly erroneous in awarding counsel fees. Nowhere in these exceptions did William raise the issue of Colleen's general standing as a petitioner. In his memorandum in support of the exceptions, he asserted only that she could not

stand in the shoes of her mother and attempt to collect support for a period prior to the filing of her petition.

After hearing argument, the court announced that it was going to grant the exceptions because "I don't think the equities in this case would warrant granting a judgment to the intervenor in this case," that the facts presented to the master did not "justify a finding that Colleen spent any of her money on behalf of [Fiona]." That finding was based entirely on the fact that Colleen received $500/month on Fiona's behalf from Social Security and that the guideline child support based on William's salary would only have been $497/month, so "I am not sure there would have been any needs of the child based on the guideline." The court then declared that the exceptions would be sustained "without prejudice for [Colleen] or anyone else to file a proper petition to be appointed guardian of the child and for any arrears found to be due and owing to be given to the guardian of the child," but that it would not enter judgment of $5,600 to Colleen "with no guarantee that Colleen is going to spend that money or has spent that money on the child." On February 11, 2000, the court entered an order declaring "that the exceptions filed by [William] are hereby sustained, without prejudice." This appeal was noted from that order. No judgment—no order denying or dismissing Colleen's motion for relief—has ever been filed.

Overlooking that jurisdictional deficiency and apparently treating the "without prejudice" caveat as a conclusion by the trial court that Colleen lacked standing to seek payment of the arrearage, the Court of Special Appeals expressed its disagreement and held that, as the functioning parent of Fiona, Colleen *did* have standing. *O'Brien v. O'Brien, supra,* 136 Md.App. at 508, 766 A.2d at 216–17. Citing *Drummond v. State,* 350 Md. 502, 714 A.2d 163 (1998), the intermediate appellate court found error as well in the trial court's reliance on the social security benefits as bearing on William's continuing obligation for support and held that, in light of the evidence presented to the master, the court's finding that Colleen had not established that she had, in fact, supported Fiona was erroneous. *Id.* at 510–11, 766 A.2d at 218. On

those grounds, the "judgment" of the Circuit Court was reversed and the case remanded for further proceedings with respect to Colleen's request for attorney's fees. Implicit in that ruling was a direction that the other exceptions filed by Williams were to be overruled.

■ With exceptions not relevant here, an appeal may be taken to the Court of Special Appeals under Maryland Code, § 12–301 of the Courts and Judicial Proceedings Article, only from a "final judgment entered in a civil or criminal case by a circuit court." In construing that statute, we have held that, if a ruling of the Circuit Court is to constitute a final judgment, it must, among other things, be an "unqualified, final disposition of the matter in controversy." *Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767, 773 (1989); *Davis v. Davis,* 335 Md. 699, 711, 646 A.2d 365, 370 (1994). An order sustaining exceptions to a master's recommendation does not constitute such a disposition.

■ As we recently confirmed in *Harryman v. State,* 359 Md. 492, 505, 754 A.2d 1018, 1025 (2000), "a master is not a judicial officer, and is not vested with judicial powers." The master serves as an assistant and advisor to the court. Upon referral of a matter, in this instance pursuant to former Maryland Rule 9–207, as it existed in 1999,[5] the master is authorized to take testimony and to make a report to the court. The report includes a statement of the master's findings, based on the evidence taken, and a proposed order. The master's report is advisory only, however. His or her findings of fact are to be treated as prima facie correct and are not to be disturbed by the court unless found to be clearly erroneous, *i.e.,* unsupported by substantial evidence in the record before the master, but the master's ultimate conclusions are merely

5. The rule dealing with the referral of family law matters to masters that existed during the relevant times in this case was codified as Rule 9–207 (1999). The rule was rewritten in 2000 and was rewritten again in 2001 as Rule 9–208. The re-writings had mostly to do with contempt proceedings and would not affect the result we reach here under the 1999 version of the rule.

recommendatory and must be reviewed by the court "with an independent exercise of judgment. . . ." *Harryman v. State, supra,* 359 Md. at 507, 754 A.2d at 1026; *Domingues v. Johnson,* 323 Md. 486, 491–92, 593 A.2d 1133, 1135 (1991). *See also* Maryland Rule 2 541(c)(7) (authorizing a master to "[r]ecommend findings of fact and conclusions of law").

If no exceptions are timely filed to the master's recommendation, the court may proceed to enter an order or judgment. 1999 Md. Rule 9–207(h). In this case, had no exceptions been filed, the court could have entered a judgment against William for the amount of arrearage found by the master. If, as here, exceptions are timely filed, the court must hold a hearing on them, if a hearing is requested. Rule 9–207(f) required that exceptions "set forth the asserted error [in the master's recommendation] with particularity." With that requirement, exceptions serve a dual purpose—to inform the court, first, that the excepting party is not satisfied with the master's recommendation, and, second, of the reason why the court should not accept that recommendation.

Upon consideration of an exception, the court normally will come to one of three conclusions—that the exception has no substantive merit and that the court should act in conformance with the master's recommendation, that the exception has some substantive merit and that the court should therefore reject the recommendation, in whole or in part, and make a different ruling, or that there is or may be merit to the exception but that some further proceeding is required before a final ruling is appropriate. In either of the first two situations, the court must do two things in order to terminate the matter. It must rule upon the exceptions, either by sustaining or overruling them, *and it must then enter an appropriate order consistent with that ruling.* In this instance, where the court sustained the exceptions, the next required, and final, step would have been an order denying Colleen's motion for relief. That would have terminated the case.

Merely sustaining, or overruling, exceptions does not end the case in the Circuit Court, and it therefore does not

constitute a judgment, even if the parties and the court believe that, for practical purposes, the case is over. It is not over until a judgment, entered in conformance with Rule 2–601, is signed and entered on the docket. As that has yet to occur, Colleen's appeal was plainly premature and it should have been dismissed by the Court of Special Appeals. *But cf. McGonigal v. Plummer*, 30 Md. 422 (1869). We shall vacate the judgment of that court and direct that the appeal be dismissed. That will return the case to the Circuit Court, which will have the opportunity either to reconsider the ruling on the exceptions or enter a judgment on that ruling. Should it do the latter, Colleen is free, of course, to take an appeal, seek *certiorari* in this Court, and ask that the appeal be decided on the briefs and record extract already filed, supplemented only by further orders entered by the Circuit Court. In the exercise of our discretion, we shall direct that the costs in this Court and the Court of Special Appeals be paid by petitioner.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO DISMISS APPEAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.