*Davona Grant, et al. v. County Council of Prince George's County Sitting as the District Council, et. al.*, No. 75, September Term, 2018.  Opinion by Getty, J.

**ZONING AND PLANNING—SOURCE AND SCOPE OF POWER**

The Court of Appeals held that the County Council of Prince George's County sitting as the District Council ("District Council") was authorized under the Regional District Act ("RDA") to delegate to its staff attorney the responsibility of preparing a proposed opinion and order and written findings of fact.

**MUNICIPAL CORPORATIONS—RULES OF PROCEDURE AND CONDUCT OF BUSINESS OPEN MEETINGS ACT**

The Court of Appeals held that Petitioner, Davona Grant, failed to present sufficient evidence that the District Council violated the Open Meetings Act.  The record is devoid of any evidence that the District Council communicated amongst itself or through its staff between its two hearings, and, therefore, Grant is unable to rebut the statutory presumption that the District Council complied with the Act.

**ZONING AND PLANNING—SOURCE AND SCOPE OF POWER**

The Court of Appeals held that the District Council, through Prince George's County Code § 27-132(f)(1), exercises original jurisdiction over special exception and variance applications.  The RDA bestows upon the District Council wide-ranging authority to regulate zoning within its district.  The RDA does not limit the District Council's jurisdiction over zoning cases and does not confer exclusive jurisdiction over such cases on another entity.

IN THE COURT OF APPEALS
OF MARYLAND

No. 75

September Term, 2018

---

DAVONA GRANT, et al.

v.

COUNTY COUNCIL OF PRINCE
GEORGE'S COUNTY SITTING AS THE
DISTRICT COUNCIL, et al.

---

Barbera, C.J.
\*Greene,
McDonald,
Watts,
Hotten,
Getty,
Booth,

JJ.

---

Opinion by Getty, J.

---

Filed: August 20, 2019

\*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

> Most judges and lawyers, and many public officials and members of the general public, are uninitiated (and perhaps even uninterested, unless their oxen are being gored) in the mysteries of land use regulation.
>
> Judge Glenn T. Harrell, Jr.
> *Cty. Council of Prince George's Cty. v. Zimmer Dev. Co.*, 444 Md. 490, 502 (2015).[1]

In the instant appeal we write another chapter to the mysteries of the zoning powers, special exceptions and variances authorized by state and local codes for the Prince George's County Council sitting as the District Council ("District Council"), so aptly described in the past by Judge Glenn T. Harrell, Jr. First, we must determine whether the District Council was authorized to delegate the preparation of its opinion and order to its staff attorney. The second issue is whether the District Council engaged in an "evasive device" intended to circumvent the requirements of the Maryland Open Meetings Act. Third, we must determine whether the District Council exercises original or appellate jurisdiction when it reviews decisions concerning special exceptions and variances from the Zoning Hearing Examiner ("ZHE").

We ultimately hold that the District Council is authorized to delegate to its staff attorney the preparation of a draft decision and that the District Council rightfully exercises original jurisdiction when hearing zoning cases from the ZHE. In addition, we conclude

---

[1] For a detailed discussion on the history of land use regulation in Maryland, an exhaustive review of the differences between zoning and planning, and generally "A Mind-Numbing Primer" concerning land use regulation within Prince George's County, *see Zimmer Dev. Co.*, 444 Md. at 502-534 (2015).

that the Petitioners failed to present sufficient evidence that the District Council violated the Open Meetings Act.

## BACKGROUND

In 2014, Wal-Mart Real Estate Business Trust ("Wal-Mart") applied to the Maryland-National Capital Park and Planning Commission ("MNCPPC") for a special exception, variance, and an alternative compliance regarding an existing store located in the Woodyard Crossing Shopping Center in Clinton, Maryland.[2] The store was originally constructed in 2000 as a 134,241 square foot facility. The special exception and variance applications were made in connection with Wal-Mart's intended goal of expanding the store to include an outdoor garden center and grocery store, and to eliminate the existing automotive servicing facility. The planned expansion would increase the building's square footage by 37,393 square feet.

The impetus that drove Wal-Mart to apply for a special exception stems from the type of commercial zoning in question. The property is located within an area designated as a Commercial Shopping Center ("CSC") Zone. *See* PGCC § 27-454 (describing the nature of the CSC Zone). Although Wal-Mart's current and intended future uses are individually allowed in the CSC Zone, the expansion required a special exception to combine all of these uses on a single parcel within a CSC Zone. *See* Prince George's County Code ("PGCC") § 27-461(a)-(b) (outlining the permitted uses of land relative to its zoning designation).

---

[2] MNCPPC's development review division reviewed Wal-Mart's application for a special exception and variance.

Separately, the requirement for Wal-Mart to apply for a variance was not triggered by its plans to expand the existing store but instead was due to subsequent changes in the zoning code. When the store was built in 2000, the relevant portions of the PGCC required a fifty-foot set back from the surrounding properties.[3] In 2002, the provision within the PGCC, i.e. PGCC § 27-348.02(a)(5), was amended to require a 100-foot setback. This left Wal-Mart in the awkward position where the existing store did not comply with the setback requirements as amended. Accordingly, the variance application concerns Wal-Mart's existing facility and not its proposed expansion.

In addition, the MNCPPC Planning Director had previously approved multiple alternative compliance applications concerning the Wal-Mart facility that needed to be amended under the new application. For example, in 1999 the Planning Director approved an alternative compliance application made by Wal-Mart that provided an alternative buffering scheme between the Wal-Mart and residentially zoned properties located to its west.[4]

In Maryland, traditional land use powers are generally delegated by the State to local political subdivisions. *Zimmer*, 444 Md. at 504-05. For Prince George's County, the State

---

[3] A "setback" requirement, such as that found in PGCC § 27-348.02(a)(5), requires that other buildings, structures, and off-street parking must be a certain distance from any adjoining land in a residential zone.

[4] The amendment of the 1999 alternative compliance application, requested by Wal-Mart in the instant case, primarily concerned the store's surrounding landscaping, parking, and a perimeter fence. Nonetheless, the alternative compliance applications are ancillary within the instant appeal and our review focuses on Wal-Mart's special exception and variance applications.

Regional District Act ("RDA"), authorizes the District Council to adopt, amend and administer zoning laws within the county. 2012 Md. Code, Land Use ("LU") § 22-104(a). The definition of "District Council" however, varies depending on the geographical delineations of the area concerned. In situations involving zoning actions entirely within Prince George's County, the County Council of Prince George's County sits as the District Council. LU § 22-101(b).

When acting in its zoning capacity, the District Council acts as an administrative agency. *Cty. Council of Prince George's Cty. v. Brandywine Enter., Inc.*, 350 Md. 339, 342 (1998). The instant appeal concerns a challenge to the decision of the District Council that reversed a decision of the ZHE as described below.

*Proceedings Before the Zoning Hearing Examiner (ZHE)*

In response to Wal-Mart's application for a special exception and variance, the MNCPPC development review division issued a report ("Staff Report") which recommended that Wal-Mart's special exception and variance application be denied but its alternative compliance request should be approved.[5] The Prince George's County Planning Board declined to hear the case and instead adopted the Staff Report's

---

[5]In special exception cases, the MNCPPC's development review division is required to compile a report which recommends whether the special exception should be approved or denied. PGCC §§ 27-311, 27-307. The MNCPPC development review division determined that Wal-Mart's variance request had failed to meet two of three criteria: (i) extraordinary situations or conditions; and (ii) exceptional undue hardship. The Staff Report indicates that the application for a variance was primarily denied based on the issue concerning the 100-foot setback requirements. The Staff Report states, "[i]n this case, staff is particularly concerned with the impact of the proposed use on the residential properties to the west and the applicant's request for a variance to the prescribed 100-foot setback."

4

recommendation,[6] as permitted under PGCC § 27-210, and assigned the case to a ZHE to conduct an evidentiary hearing. The ZHE then held hearings wherein she heard testimony and accepted evidence from those involved. On May 13, 2016, the ZHE issued its decision.

In its decision, the ZHE found the following: (1) that the existing store does not comply with the 100-foot setback requirement; (2) that stormwater runoff from the shopping center in which the Wal-Mart is located floods the neighboring residential communities; (3) that the area is already subject to significant traffic congestion; and (4) that the shopping center in which the Wal-Mart is located draws a greater amount of individuals to the area which, in turn, contributes to an increase in crime throughout the neighboring area. Therefore, the ZHE denied Wal-Mart's application for a special exception and variance. The ZHE's decision was transmitted to the District Council and hand-delivered to Rajesh Kumar, Principal Counsel to the District Council.[7]

Wal-Mart filed exceptions to the ZHE's decision on June 13, 2016 and requested that the District Council hear the case. That same day, the District Council elected, by unanimous vote, to take up the matter and make the final decision concerning Wal-Mart's

---

[6] Under the RDA, county planning boards consist of appointed commissioners. LU § 20-201; LU § 20-101(c); The Maryland-National Capital Park and Planning Commission, *Meet the Commissioners*, *available at:* http://www.pgparks.com/826/Meet-the-Commissioners (https://perma.cc/E23Z-SWNY) (last visited August 19, 2019). The county planning boards are responsible for administering certain local functions within their respective counties. *See* LU § 20-202. Under the PGCC, the Planning Board has the discretion to decide whether it will hold a hearing. PGCC § 27-210(a). If the Planning Board decides not to hear a case within fifteen days after publication of the Staff Report, the Planning Board is deemed to adopt the Staff Report's recommendation. LU § 27-210.

[7] In accordance with the question before this Court, we occasionally refer to Mr. Kumar as the District Council's "staff attorney."

special exception and variance applications. Two days later, on June 15, the Clerk of the District Council sent notices to all parties involved that the District Council had scheduled oral arguments on July 18. Therefore, all parties on record were provided notice well in advance that the District Council would be hearing the case with oral arguments on July 18.

Prior to the hearing, as noted earlier, Wal-Mart filed written exceptions to the ZHE's decision. In response, Ms. Davona Grant and other citizen protestants (collectively referred to in this opinion as "Grant")[8] filed a lengthy response in opposition to Wal-Mart's exceptions that included "Proposed Findings of Fact and Conclusions of Law" based upon their position that the ZHE's decision should be affirmed. According to statements made by Mr. Kumar at oral argument, he reviewed the record, Wal-Mart's exceptions, Grant's filings including their proposed findings and other materials submitted to the District Council and began preparing a draft decision in advance of the July 18 hearing.

*Proceedings Before the District Council*

At the hearing before the District Council on July 18, 2016, testimony was received from citizens and expert witnesses regarding the special exception and variance. Attorneys for both sides discussed the proposed expansion and its impact on traffic, architecture,

---

[8] The Petitioners in this case are: Davona Grant, Jackie Foster, Donald Hancock, Larry Herschell, Frederick Holt, Willie L. Lee, George N. Leftwood, Jr., Wylie D. Powell, Jr., Marjorie M. Sproesser, and Jose L. Ventura. Before the ZHE, the record reflects that these individuals participated in the hearing: Grant, Foster, Hancock, Holt, Lee, Leftwood, and Sproesser.

crime, and other factors. At the end of the hearing, District Council Member Mel Franklin,[9] motioned to have Mr. Kumar prepare a proposed opinion and order with written findings of fact reversing the ZHE's decision and in support of his motion stated in detail,

> This is a challenging case. It is, one, challenging because this is an existing shopping center. The Walmart in question is not in great condition aesthetically. And Clinton, in general, is in—is a, you know, as a community, it has challenges with the quality of its commercial opportunities or commercial options in Clinton. So there is a big need for investment and redevelopment or reinvestment or renovation and all of the like in Clinton in particular. And so and all of those things are important.

> Obviously this is the kind of case, because it's before the District Council, like any other District Council case, has to be decided on the law. And it is my belief that this sort of boils down to an existing shopping center that essentially, because of the dynamics of the existing shopping center, it is creating the legal problems with this proposed expansion and reinvestment. And so the, in my view, the reasons for the variance and whether variances, the variance request is reasonable is, in large part, most of what's been raised has to do with the difficulties with the existing site. It is not related to the challenges or problems with the expansion.

> I do appreciate what [People's Zoning Counsel, Stan] Brown or what the opposition have said about frontage. I do believe that legally we, there is a sound justification on the frontage issue. And I do want to thank all of the residents who participated in this process on both sides. Obviously, this is the largest anchor or will be the largest anchor of what is essentially the largest shopping center in Clinton. So it certainly has importance in the community. And this shopping center in particular needs to thrive. It needs to thrive in large part because it is the most significant commercial presence in Clinton. It is in need of reinvestment. It is in need of redevelopment. And the hope is that the reinvestment or redevelopment will happen in Clinton, happen at this shopping center.

> With that, I'm going to move that to direct Staff to prepare an Order reversing the decision of the Zoning Hearing Examiner and prescribing approval with conditions.

---

[9]For clarity, it is important to note that at the time of these proceedings in 2016, Mr. Franklin was the District Council member from District 9, the District in which the Wal-Mart store is located. However, Mr. Franklin is currently an at-large member on the District Council having been elected to the at-large seat in the 2018 General Election.

His motion to have the staff attorney prepare a draft order reversing the decision of the ZHE received a unanimous vote by the District Council.

The following day, July 19, Mr. Kumar presented to the District Council a proposed fifty-one page order. Initially, the approval was mistakenly titled as being an "Approval with Conditions." However, as Mr. Kumar explained to the District Council during the open meeting, the order was not actually subject to conditions. Mr. Kumar commented,

> [j]ust one correction, the Ordinance does not have conditions because the Order itself addresses the concerns that were raised at Oral Argument and Technical Staff including architectural renderings that were revised by the Applicant and submitted into the record, and that can be found on your draft, Page 46. That's the exhibit that [Counsel for Grant] referred to during Oral Argument on Monday. This is the actual renderings that will be done to the site. The entire Walmart is being redone.
>
> In addition, there is not a condition regarding stormwater because [Wal-Mart] obtained a revised Stormwater Conceptual Plan, which is basically on Page 29 of the Order. It outlines all of the requirements that the Applicant must comply with as part of the new development. Regarding buffering, the Applicant obtained approval from the Planning Director for alternative compliance. There will be buffering on the site. There is [sic] photographs in the record regarding the fence. The fence is intact. It is a board-on-board fence with plantings on the residential side as well as the commercial side.

The proposed order contained findings of fact distinct from those issued by the ZHE.[10] As directed by the District Council, the proposed order approved Wal-Mart's application for a special exception and variance. The District Council, continuing in the open session, then moved to adopt the order which carried by a seven to two vote. There

---

[10] The fact that the District Council engaged in its own factfinding has greater implications in terms of the third issue before this Court. If the District Council exercises original jurisdiction in such cases, it is not limited to the factual findings established by the ZHE. However, if the District Council exercised merely appellate jurisdiction over such cases, then it would not be permitted to engage in such factfinding and its review would be limited to facts found by the ZHE.

is no evidence that any District Council members met or discussed the application or the findings of fact during the intervening time period between the July 18 and July 19 hearings.

*Judicial Review of the District Council's Actions*

As a result of the District Council's action, Grant filed a petition for judicial review on August 11, 2016. The appeal was heard by the Circuit Court for Prince George's County on April 20, 2017. The circuit court affirmed the District Council's decision in an order and opinion dated June 7, 2017.

In response, Grant filed a notice of appeal in the circuit court and appealed its decision to the Court of Special Appeals. In addition to the arguments concerning Wal-Mart's special exception and variance applications, Grant averred that the District Council violated the Open Meetings Act based on its conduct between its July 18 and 19 hearings.[11] In an unreported decision dated December 3, 2018, the Court of Special Appeals determined that the District Council applied the wrong legal standard and remanded the case to the District Council. In addition, the court concluded Grant failed to prove a violation of the Open Meetings Act occurred.

Thereafter, Grant petitioned this Court for writ of certiorari, which we granted on March 5, 2019. On appeal, the parties are joined by Amicus Curiae, Barnabas Road

---

[11] There, Grant argued that the District Council held a furtive meeting between its July 18 and 19 hearings in which it deliberated on Wal-Mart's special exception, variance application, and the District Council's proposed order.

Associates, LLC, who write in support of Grant's position. In her petition for a writ of certiorari, Grant presents three issues:

1. Whether Maryland administrative law authorizes a zoning tribunal to vote to approve a special exception without deliberating on the factual issues and then delegate to its staff attorney the authority to make the required factual findings without informing the staff attorney of the factual basis of the tribunal's decision.

2. If, as the Court of Special Appeals postulated, the District Council's staff attorney prepared a draft opinion and showed it separately to individual members of the District Council before the July 19 meeting, whether such a process is an "evasive device" which violates the Open Meeting Act.

3. Whether the District Council erred by exercising original jurisdiction when it reversed the Zoning Hearing Examiner's decision.

**STANDARD OF REVIEW**

In reviewing an administrative agency's decision regarding a special exception "we look through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate[ ] the decision of the agency." *People's Counsel for Balt. Cty. v. Loyola Coll. in Md.*, 406 Md. 54, 66 (2008) (internal quotation marks omitted) (citing *People's Counsel for Balt. Cty. v. Surina*, 400 Md. 662, 681 (2007)). In such situations, we review the evidence adduced in the courts below to determine "whether the zoning body's determination was supported by 'such evidence as a reasonable mind might accept as adequate to support a conclusion[.]'" *Loyola Coll. in Md.*, 406 Md. at 67.

However, we review legal questions or the agency's conclusions of laws de novo. *Town of Oxford v. Koste*, 431 Md. 14, 25 (2013). Because the parties dispute solely the

10

applicability of certain statutory provisions of the RDA, PGCC, and Open Meetings Act. we review these legal questions de novo.

## DISCUSSION

### A. The District Council was Authorized to Delegate Preparation of its Proposed Opinion to its Staff Attorney for its Subsequent Consideration and Adoption.

Grant argues that the procedure undertaken by the District Council in the instant case stands in opposition to Maryland administrative law. Specifically, she argues that the District Council failed to make required factual findings, delegated to its staff attorney the authority to draft its decision and make factual findings, and failed to properly inform its staff attorney of the relevant factual findings that would support its decision.

Her arguments are primarily based on the limited statutory language that defines the role of Principal Counsel and technical staff within proceedings before the District Council. To support her position that Principal Counsel lacks the authority to prepare a draft findings of fact and decision, she directs the Court to various provisions of the Prince George's Charter,[12] the RDA, the PGCC and the Zoning Ordinances, which describe the duties of the Technical Staff, the Planning Board, the ZHE, People's Zoning Counsel, and the District Council in the administrative review and application for a special exception. By contrast, Grant contends that the RDA, the Charter, and the PGCC, including the Zoning Ordinances, do not establish the position of Principal Counsel.

---

[12] Grant's reliance on the Charter in this context is misplaced. In *Prince George's Cty. v. Maryland-National Capital Park and Planning Comm'n*, 269 Md. 202 (1973), we held that Article VII of the Charter has no force and effect within that portion of Prince George's County within the Regional District.

11

Grant argues that an administrative agency may only delegate authority to its staff where the agency's enabling statute specifically permits such a delegation. To support her argument, she relies on *Pub. Service Comm'n of Md. v. Wilson*, 389 Md. 27, 52 (2005). In *Wilson*, we were tasked with determining whether the Chairman ("the Chairman") of the Public Service Commission ("the Commission") acted improperly by unilaterally terminating an employee. *Id.* at 33-34. In that case, the Court held that the Chairman did not have the unilateral authority to terminate an employee. *Id.* at 59.

Grant reads *Wilson* to endorse the proposition that administrative agencies may only delegate authority to perform a certain function to its staff if that agency's enabling statute authorizes such delegation.[13] As mentioned earlier, the District Council's existence is attributable to the RDA. Accordingly, the RDA is the enabling statute through which the District Council draws its powers to establish local zoning law. *See Zimmer*, 444 Md. at 523-24. Therefore, she contends that based on *Wilson*, the District Council is only permitted to delegate to its staff attorney the responsibility of preparing a draft decision if the RDA authorizes such delegation. However, we find that her arguments misconstrue our holding in *Wilson*.

In *Wilson*, we held only that the Chairman did not have the unilateral authority to terminate employees because the relevant provisions of the Commission's enabling statute

---

[13] An enabling statute is a statute that empowers an administrative agency to engage in a specific administrative function and establishes the outer limits of such an agency's power. *Dep't of Econ. and Employment Dev. v. Lilley*, 106 Md. App. 744, 759 (1995) ("administrative agencies derive their power from enabling statutes that govern them."). *See also Zimmer Dev. Co.*, 444 Md. at 518 (detailing the role enabling statutes play in reference to zoning).

bestowed that power upon the Commission as a whole. *Wilson*, 389 Md. at 58-59. This becomes increasingly evident throughout the Court's analysis:

> Language appears throughout the statute authorizing the Commission to "hire" or "appoint" all types of employees of the PSC. In contrast, there is no mention in this statute, nor any other statute we could find, of language that outlines the Chairman's authority, independent of the Commission's, to "hire" or "appoint" employees of the PSC. Although § 2–108(d) [of the Public Utilities Companies Article ("PU")] does not discuss specifically the authority of the Commission to terminate employees, [PU] § 2–108(d) states that "all personnel of the Commission are subject to the provisions of the State Personnel and Pensions Article." That Article governs the termination of PSC employees, specifically those employees in the executive and management services, and those who are special appointments, all of which "serve[ ] at the pleasure of the employee's appointing authority" and "may be terminated from employment for any reason, solely in the discretion of the appointing authority." § 11–305. **Because [PU] § 2–108(d) constructs a statutory scheme outlining both the Commission's explicit authority to hire and implicit authority to terminate employees of the PSC, we conclude that the Commission as a whole is the "appointing authority."**

*Wilson*, 389 Md. 27, 52 (2005) (emphasis added).

*Wilson* addressed the Chairman's authority to take final action—the termination of an employee—where the statute required the Commission as a whole to make final employment decisions. Clearly, the *Wilson* Court did not hold that "Maryland law only authorizes an administrative agency to delegate certain authority to an employee of the agency if the agency's enabling statutes authorizes such a delegation" as Grant contends. Pet. Br. at 10. Instead, the Court held that the head of an administrative body may not take unilateral action that directly contravenes the express powers granted to that agency "as a whole" through its enabling statute.

In this case, the District Council did not delegate the final decision-making authority for granting or denying Wal-Mart's special exception and variance to Principal Counsel—

13

rather, it delegated the preparation of a draft findings of fact and conclusions of law for the District Council's deliberation and consideration. On July 18, the District Council directed Principal Counsel to prepare a draft for its consideration. On July 19, the District Council subsequently met and voted to approve the findings of fact and conclusions as set forth in the document. There was no impermissible delegation of its final decision-making authority to staff. We find Grant's reliance on *Wilson* unpersuasive.

As previously discussed, the RDA is the District Council's enabling statute. The RDA bestows upon the District Council the authority to regulate zoning and establish procedures and provisions regarding zoning hearings. Under the RDA, any decision concerning a special exception requires a written finding of material facts and conclusions. LU § 25-204. Under the RDA, LU § 22-206 grants to the District Council the power to regulate zoning:

(a)     A district council may amend its zoning laws, including any maps:

(1)     in accordance with procedures established in its zoning laws; and

(2)     after holding an advertised public hearing.

(b)     The procedures and zoning laws may include:

(1)     procedures limiting the times when amendments may be adopted;

(2)     provisions for hearings and preliminary determinations by an examiner, a board, or any other unit;

(3)     procedures for quorums, number of votes required to enact amendments, and variations or increases based on factors such as master plans, recommendations of the hearing examiner, county planning board, municipal corporation, governed special taxing district, or other body, and

14

petitions of abutting property owners, and the evidentiary value that may be accorded to any of these factors; and

(4) procedures for hearings, notice, costs, fees, amendment of applications, recordings, reverter, lapse, and reconsideration de novo of undeveloped zoning amendments.

LU § 22-206(a)--(b).

Another provision, LU § 22-301 details the District Council's role within hearings on special exceptions and variances:

(a)(1) A district council may adopt zoning laws that authorize the board of appeals, the district council, or an administrative office or agency designated by the district council to grant special exceptions and variances to the zoning laws on conditions that are necessary to carry out the purposes of this division.

(2) Any zoning law adopted under this subsection shall contain appropriate standards and safeguards to ensure that any special exception or variance that is granted is consistent with the general purposes and intent of the zoning laws.

(b) Subject to § 22-309 of this subtitle, an appeal from a decision of an administrative office or agency designated under this subtitle shall follow the procedure determined by the district council.

(c) The district council may authorize the board of appeals to interpret zoning maps or decide questions, such as the location of lot lines or district boundary lines, as the questions arise in the administration of zoning laws.

LU § 22-301.

As evident, the RDA empowers the District Council to pass zoning laws and grants broad authority to the District Council. The District Council sits as an administrative agency when reviewing a zoning matter. *Brandywine Enter.*, 350 Md. at 342 ("The Regional District Act authorizes the County Council to sit as a district council in zoning matters, and, when it does so, it is acting as an administrative agency."). Under the RDA,

15

the District Council is required to make written findings of fact. Not only are the findings and conclusions required to be in writing, but they must be meaningful, and may not simply recite the statutory criteria or make boilerplate resolutions. *See Bucktail v. Talbot* Cty., 352 Md. 530, 553 (1999). *See also Critical Area Comm'n v. Moreland*, 418 Md. 111, 134 (2011) (noting that when a Board of Appeals merely states conclusions of law without pointing to the evidentiary base for those conclusions, such findings are not amenable to meaningful judicial review and remand is warranted).

After considering the evidence, the District Council must reduce its findings of fact and conclusions of law to writing. As part of this process, someone must take the initial step of putting pen to paper and assembling the proposed findings and conclusions of law for consideration by the District Council. In many instances, the public body charged with making that decision—whether a legislative body or a board of appeals—requests that its staff or attorney prepare the initial draft for the collective review and ultimate approval of the public body as a whole. There is nothing in the RDA, the PGCC or administrative law generally which prohibits this standard practice.

The RDA grants unto the District Council extensive authority to adopt zoning laws and procedures concerning special exceptions and variances. LU §§ 22-206, 22-301. Additionally, the RDA contains no language restricting the District Council from delegating to its staff attorney the responsibility of preparing a proposed order and the accompanying draft findings of fact. Moreover, Grant fails to identify any provisions within the PGCC or the RDA that would prohibit the District Council from delegating to

16

its staff attorney the responsibility of drafting a proposed order for the District Council's consideration.

The power to delegate to its staff attorney the ability to draft a proposed order and findings of fact falls under the umbrella of authority granted unto the District Council under the RDA. In fact, through the grant of zoning authority under the RDA, the District Council has established provisions of the PGCC which implicitly enable the District Council to delegate to its staff attorney the responsibility of preparing a proposed order. In a section titled "voting and attendance records" of the District Council's hearing procedures under the PGCC, the District Council must record a vote concerning "[a]ny District Council instructions for the preparation of findings of fact and conclusions, or other relative documents, necessary for use by the Council in taking action." PGCC § 27-132(a)(4)(A)(iv). Implicitly, the provision indicates that the District Council may delegate the preparation of a proposed order, which includes findings of fact, to its staff attorney. Therefore, under the PGCC, the District Council may permissibly delegate the preparation of "findings of fact and conclusions, or other relative documents[] necessary" to its staff attorney. *Id.*

Confirming our interpretation, the Rules of Procedure for the Prince George's County District Council provide that "[t]he final action shall clearly articulate the policy or the basis in the record for the Council's action.[14] Upon final review of a zoning

---

[14] The Rules of Procedure for the Prince George's County District Council are distinct from the District Council's hearing procedures enacted through the PGCC. *See* PGCC § 27-132; Rules of Procedure for the Prince George's County District Council (2018) *available*

17

application or case, the District Council shall adopt a written document that embodies a final decision." Rule 7, Rules of Procedure for the Prince George's County District Council (2018). Accordingly, under the procedural rules governing the District Council's activities, the staff attorney's proposed order and the accompanying findings of fact were adopted by the District Council upon obtaining the requisite number of votes in an open meeting. At that point, the proposed order itself and the included findings of facts became that of the District Council and not of its staff attorney.

Grant argues that "[n]othing in the RDA, the County Code, or the Zoning Ordinance suggests that the District Council has the authority to delegate to the Principal Counsel the Authority to make his own factual findings in a special exception case." Pet. Br. 11. Grant's argument is based upon the faulty premise that the District Council delegated its **decision-making authority** to its staff attorney and failed to **deliberate.** While the District Council certainly could have undertaken more deliberation at its meetings on July 18 and July 19, we do not find that the District Council abdicated its decision-making authority to Principal Counsel. Based upon the record, we find that on July 18, the District Council voted and gave tentative approval of the special exception and variance application and asked Principal Counsel to prepare an appropriate order for Council's review and consideration. Principal Counsel prepared the draft findings of fact and conclusions of law. The following day, the District Council met and voted to approve the findings of fact

---

at: https://pgccouncil.us/DocumentCenter/View/3890/District-Council-Rules-of-Procedure (https://perma.cc/7J3W-9L8X) (last visited Aug. 19, 2019).

18

and conclusions of law. The record contains sufficient evidence of the District Council's deliberation for us to uphold its decision in this case.

Based upon the record in this case, although we do not find that the District Council improperly delegated its decision-making authority to Principal Counsel, we caution that more deliberation by the public body—rather than the very bare minimum—is always encouraged. When a public body acting in a quasi-judicial capacity undertakes the most minimal skeletal procedural acts when adopting the findings of fact and conclusions of law, the public body should not be surprised by public skepticism or criticism, or a legal challenge of its decision.

**B. Grant Presents Insufficient Evidence that the District Council Violated the Open Meetings Act.**

*Grant's Contentions Related to the Open Meetings Act*

Grant alleges that the District Council violated the Open Meetings Act during the deliberation process in connection with its approval of Wal-Mart's special exception and variance application. Grant asks the Court to find a violation of the Open Meetings Act based upon the following sequence of events:

> On July 18, at an open meeting, the District Council gave tentative approval for the special exception and variance and asked Principal Counsel to prepare an appropriate order for the Council's review and consideration; and

> On July 19, again at an open meeting, the District Council voted to approve a 51-page Findings of Fact and Conclusions of Law granting the special exception and variance.

During her appeal to the Court of Special Appeals, Grant asked the intermediate appellate court to "infer[] from the conduct of the two public meetings that a secret,

19

undisclosed third meeting occurred between the meeting of July 18 and the meeting of July 19." *Grant v. Cty. Council of Prince George's Cty.*, No. 809, Sept. Term 2017, 2018 WL 6329825, at \*4 (Md. Ct. Spec. App. Dec. 3, 2018). In rejecting Grant's hypothesis, the Court of Special Appeals stated that "[t]here is, however, no evidence in the record that suggests that such a meeting occurred, and Grant did not introduce any testimony before the circuit court to support her contentions." *Grant* at \*7. In theory, the Court of Special Appeals presented an alternative hypothesis to Grant's surreptitious meeting theory:

> It could have happened as Grant suggests. More likely, however, the staff prepared a draft opinion and showed it separately to individual members of the District Council before the July 19 meeting. If that's what happened, a quorum never met, no public business was conducted, and the Open Meetings Act was not triggered.

*Grant,* at \*7-8. On appeal to this Court, Grant contends that the scenario described by the Court of Special Appeals assumes that Mr. Kumar was able to write the fifty-one page draft Findings of Fact and Conclusions of Law ("Findings of Fact") and meet with each District Council member during the night hours after the conclusion of the July 18 proceeding and before the Council reconvened on July 19. Grant asserts that such a scenario is unrealistic. Grant further contends that if such a scenario in fact occurred, it violated the Open Meetings Act's requirement that the public be allowed to observe the agency's deliberation. Grant posits that such conduct would constitute a "walking quorum"—a term sometimes used by other states interpreting their state statutory open meetings act requirements—and asks this Court to hold that where a staff attorney meets individually with one or more members, but less than a quorum of the public body, such action violates the Open Meetings Act.

20

In response to Grant's assertions, the District Council and Wal-Mart argue that Grant has failed to present any evidence that a violation of the Open Meetings Act occurred. The District Council and Wal-Mart argue that Grant is now advancing a new argument based upon an alternative hypothetical posed by the Court of Special Appeals in its opinion which they contend is dicta.

*The Open Meetings Act*

The first Maryland comprehensive legislation to require open meetings of public bodies was enacted in 1977. *Cmty. and Labor United for Balt. Charter Comm. ("C.L.U.B.") v. Balt. City Bd. of Elections*, 377 Md. 183, 193 (2003). The Open Meetings Act is codified at 2014 Md. Code General Provisions Article ("GP") §§ 3-101 through 3-501.[15] The legislative purpose and policy of the Open Meetings Act is clearly stated in GP § 3-102(a), that:

---

[15] Maryland's first comprehensive Open Meetings Act was codified at sections 7 through 15 of Article 76A of the Maryland Code. During Code Revision, Article 76A was re-codified as §§ 10-501 through 10-512 of the State Government Article ("SG") by Chapter 284 of the Acts of 1984 without any substantive changes. *See City of Balt. Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 321 (2006). The Act was again re-codified as §§ 3-101 through 3-501 of the General Provisions Article ("GP") by Chapter 94 of the Acts of 2014, without substantive changes. As we have commented in the past, "[c]ode revision is a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable" and is "presumed to make clear the existing meaning of the statutory law rather than to change its meaning." *Smith v. Wakefield, LP*, 462 Md. 713, 726 (2019). Maryland Code Revision began in 1970 as a long-term project to create a modern comprehensive code when Governor Marvin Mandel appointed the Commission to Revise the Annotated Code. This formal revision of the statutory law for the General Assembly was coordinated by the Department of Legislative Services. Code Revision was completed in 2016 with the enactment by the General Assembly of the Alcoholic Beverages Article.

[i]t is essential to the maintenance of a democratic society that, except in special and appropriate circumstances:

>    (1) public business be conducted openly and publicly; and
>
>    (2) The public be allowed to observe:
>
>>        (i)        The performance of public officials; and
>>
>>        (ii)       The deliberations and decisions that the making of
>>                   public policy involves.

Thus, the policy of the Open Meetings Act, which has remained unchanged since its initial enactment in 1977, is that "citizens be allowed to observe . . . the deliberations and decisions that the making of public policy involves." *C.L.U.B.*, 377 Md. at 193.

In *New Carrollton v. Rogers*, 287 Md. 56, 72 (1980), Chief Judge Robert C. Murphy expanded upon this policy behind the Open Meetings Act as follows:

> While the Act does not afford the public any right to participate in the meetings, it does assure the public right to observe the deliberative process and the making of decisions by the public body at open meetings. In this regard, it is clear that the Act applies, not only to final decisions made by the public body exercising legislative functions at public meeting, but as well to all deliberations which precede the actual legislative act or decision. . . . . It is, therefore the deliberative and decision-making process in its entirety which must be conducted in meetings open to the public since every step of the process, including the final decision itself, constitutes the consideration or transaction of public business.

To implement the legislative purpose of the Open Meetings Act, the General Assembly defined the public entities that are subject to the Act, identified the governmental functions that are covered by the Act (as well as certain functions which are exempt), set forth statutorily prescribed exemptions to the Act which permit the public body to convene

22

in closed session, outlined minimum standards for giving notice, and prescribed certain minimum requirements for disclosing in the minutes the matters discussed and actions taken in both open session and in closed session.

The Open Meetings Act states that "[e]xcept as otherwise expressly provided in this subtitle, a public body shall meet in open session"[16] which the public is invited to attend.

---

[16] The Open Meetings Act broadly defines "public body" as an entity that:

(i)  consists of at least two individuals; and
(ii) is created by:
1. The Maryland Constitution;
2. A State statute;
3. A county or municipal charter;
4. A memorandum of understanding or a master agreement to which a majority of the county boards of education and the State Department of Education are signatories;
5. an ordinance;
6. a rule, resolution or bylaw;
7. an executive order of the Governor; or
8. an executive order of the chief executive authority of a political subdivision of the state.

GP § 3-101(h)(1).  The Open Meetings Act provides that the following entities are also subsumed within the definition:

(i)  Any multimember board, commission or committee appointed by the Governor or the chief executive authority of a political subdivision of the State, or appointed by an official who is subject to the policy direction of the Governor or chief executive authority of the political subdivision, if the entity includes in its membership at least two individuals not employed by the State or the political subdivision;
(ii) Any multimember board, commission or committee that:
1. is appointed by:
   A. an entity in the Executive Branch of the State government, the members of which are appointed by the Governor, and that otherwise meets the definition of a public body under this subsection; or

23

GP §§ 3-301, 3-303.[17]   The Act further defines the term "meet" to mean "to convene a quorum of a public body to consider or to transact business." GP § 3-101(g).  "Quorum" is defined under the Act as: "(1) a majority of the members of a public body; or (2) the number of members that the law requires." GP § 3-101(k).

The Open Meetings Act does not apply to all functions of a public body.  It does not apply to a public body carrying out an administrative function, a judicial function, or a quasi-judicial function as those terms are defined by the Act.  GP §§ 3-101, 3-103(a)(1). The Act likewise does not apply to a "chance encounter, a social gathering, or any other occasion that is not intended to circumvent this title."  GP § 3-103(a)(2).

Notwithstanding the exceptions described above, the Open Meetings Act applies "to a public body when it is meeting to consider: (1) granting a license or permit; or (2) a special exception, variance, conditional use, or zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter."  GP § 3-103(b). [18]  In summary,

---

            B.  an official who is subject to the policy direction of an entity described
                 in item A of this item; and
       2.  includes in its membership at least two individuals who are not
            members of the appointing entity or employed by the State; and
   (iii)   The Maryland School for the Blind.

GP § 3-3010(h)(2).

[17] Section 3-305 sets forth the statutory exceptions where a public body is permitted to meet in closed session or adjourn an open session to a closed session.

[18] The language set forth in Section 3-103(b) (formerly SG § 10-503(b)) was added during the 1991 Legislative Session to clarify that licensing, permitting and zoning matters were expressly subject to the Act, regardless of the what "function" the public body is performing.  The language was added in response to concerns that public bodies were broadly construing the "quasi-judicial function" exemption to apply when the body

24

the Open Meetings Act will apply when the entity meets the definition of a "public body", the members of the public body are "meeting" as defined by the Act, and the public body is performing one of the functions subject to the Act.

When the Open Meetings Act applies to a meeting of a public body, the Act requires that the public has notice and an opportunity to observe the meeting. Specifically, before a public body meets either in an open session or closed meeting, it must provide the public with "reasonable advance notice of the session." GP § 3-302(a). The Act also prescribes basic parameters for the notice, as well as the manner in which such notice may be given. GP § 3-302(b), (c). In addition to the public notice requirements, any public body that intends to meet in an open session must make available to the public an agenda which details the items to be discussed within the session and indicates whether "the public body expects to close any portion of the meeting[.]" GP § 3-302.1(a). After such a meeting, the public body is required to prepare and publish minutes detailing items considered, actions taken, and votes recorded by the public body.[19]

---

undertook deliberations on matters related to licenses, permits and other zoning matters. For a comprehensive discussion of the attempts to revise this language during the 1990 and 1991 legislative sessions to ensure that consideration of zoning matters would be conducted in open session, *see Wesley Chapel v. Balt.*, 347 Md. 125, 137-147 (1997) (holding that the Act applied to hearings held by the county board of appeals on a development plan).

[19] A public body is not required to prepare minutes if the public body met in an open session that was audio or visually recorded and such multimedia is accessible to the public. GP § 3-306(b)(2)(i). In addition, the Act does not require public bodies to create and publicize minutes in situations where "the public body votes on legislation and the individual votes taken by each member of the public body who participates in the voting are posted promptly on the Internet." GP § 3-306(b)(2)(ii).

Section 3-401 of the Act, entitled "Enforcement," authorizes an aggrieved party to file a petition in the circuit court alleging Open Meetings Act violations related to the public body's failure to comply with five provisions of the Act:[20] (1) § 3-301 (which requires generally that a public body meet in open session unless the Act expressly permits otherwise); (2) § 3-302 (which requires public bodies to give notice of their meeting); (3) § 3-303 (which states the public's right to attend open meetings); (4) § 3-305 (which regulates closed sessions); and (5) § 3-306(c) (which prescribes the minimum requirements for minutes). *See* GP § 3-401(b).

In any action brought under the enforcement provisions of the Act: "(1) it is presumed that the public body did not violate any provision of . . . [the Act]; and (2) the complainant has the burden of proving the violation." GP § 3-401(c). In an action asserting

---

[20] In addition to providing a statutory process for judicial enforcement in the circuit court, the Act also establishes the Open Meetings Compliance Board ("Compliance Board,") consisting of a three-member volunteer board appointed by the Governor, the duties of which include, *inter alia*, issuing advisory opinions in response to complaints that a public body has violated the Act. *See* GP §§ 3-201, *et seq.* The statute describes the informal complaint process by which: (1) a complainant submits a complaint to the Compliance Board; (2) the Compliance Board forwards the complaint to the public body; (3) the public body provides a written response within 30 days after receipt of the complaint; and (4) after reviewing the matter, the Compliance Board issues a written opinion. GP §§ 3-205 – 207. If the Compliance Board determines that a violation has occurred, the Act requires that the public body announce the violation at its next open meeting, orally summarize the opinion, and that a majority of the members of the public body must sign the opinion and return a signed copy to the Compliance Board. GP § 3-211. The opinions of the Compliance Board are advisory, and a complainant is not required to file a complaint with the Compliance Board prior to filing an enforcement action in the circuit court. GP §§ 3-209, 3-401(e). The Office of the Attorney General provides the Compliance Board with administrative staff and counsel. GP §§ 3-203, 3-204(d). Office of the Attorney General, Open Meetings Act Manual (9th ed., rev. June 2017), 7-10 ("Open Meetings Act Manual").

26

a violation of the specific provisions identified above, the aggrieved party may request the circuit court to determine whether those provisions apply to the circumstances, and to require the public body to comply with them, or, subject to certain conditions set forth in GP § 3-401(d)(4), to "void the action of the public body."

*Proceedings Below*

In this matter, Grant filed a petition for judicial review in the circuit court, requesting it to review the District Council's Findings of Fact dated July 19, 2016. Rather than filing an enforcement action under GP § 3-401(b) of the Open Meetings Act, [21] Grant argued as

---

[21] The procedure Grant chose to pursue her Open Meetings Act contention cannot escape our comment. First, we recognize that the enforcement procedures for alleging an Open Meetings Act violation outlined in GP § 3-401(b) are not exclusive. *See* GP § 3-401(a)(3) (stating that "[t]his section does not affect or prevent the use of any other available remedies."); *see also, Handley v. Ocean Downs, LLC*, 151 Md. App. 615, 636-637 (2003) (holding that the "other available remedies" language in the Act "evidences the legislature's intent that a petition under [GP § 3-401] is not the exclusive remedy for an Open Meetings Act violation and that alleged violations may be raised in the course of a petition for judicial review of an agency's decision."). However, we should caution that attempting to establish an Open Meetings Act violation solely through an administrative appeal pursuant to Maryland Rule 7-201 *et seq.* is potentially fraught with procedural difficulties for the petitioner given that: (1) the public body is presumed to have complied with the Act and that the burden is on the petitioner to prove the violation; and (2) an administrative appeal of a zoning action is an appeal on the record in which no new evidence is typically permitted. *See* Maryland Rule 7-208(c) ("[a]dditional evidence in support of or against the agency's decision is not allowed unless permitted by law"). Although the Administrative Procedure Act ("APA") authorizes a "party to offer testimony on alleged irregularities in procedure before the [agency] that do not appear on the record" (*see* SG § 10-222(g)(2)), the APA does not apply to judicial review of zoning decisions such as the actions of the District Council in this case. *See* SG § 10-202. If a petitioner files both a petition for judicial review and an enforcement action under GP § 3-401(d), the Act gives the circuit court the express authority to consolidate those proceedings into one action which would provide the statutory basis for accepting testimony and evidence on the Open Meetings Act component of the claim. *See* GP § 3-401(d). It is also worth noting that under the enforcement provisions of the Open Meetings Act, the court has the statutory authority to assess reasonable counsel fees and other litigation expenses to the prevailing

27

part of her administrative appeal that the District Council violated the Open Meetings Act because the council members failed to deliberate in public. Grant presented no evidence to support her allegation of an Open Meetings Act violation and instead simply presented arguments of counsel.

In its written opinion upholding the decision of the District Council, the circuit court held that there was no evidence in the record that the District Council had violated the Open Meetings Act, stating as follows:

> There is nothing in the records that suggests that the meetings of the District Council were closed off to the public. The public was given proper notice in regard [] to when the meetings and deliberation would occur. There are no findings in the record that illustrate that the District Council *willfully failed to comply* with the Open Meetings Act.

(emphasis in original).

On appeal, in affirming the decision of the circuit court, the Court of Special Appeals stated the following with respect to Grant's challenge under the Open Meetings Act:

> Grant's challenge under the Open Meetings Act fails because she did not produce any evidence that a violation occurred. Instead, Grant's theory relies exclusively on inferences derived from two facts:
>
> > On July 18, at an open meeting, the District Council gave tentative approval for the special exception and variance and asked staff to prepare an appropriate order; and
> >
> > On July 19, again at an open meeting, the District Council voted to approve a 51-page order granting the special exception and variance.

---

party, and to assess a fine for willful violations. *See* GP §§ 3-401(d)(5), 3-402. No such remedies are available under the administrative rules applicable to appeals of an administrative agency's zoning decision.

Grant doesn't object to either of those two open meetings, nor could she. Rather, she infers from the conduct of the two public meetings that a secret, undisclosed third meeting occurred between the meeting of July 18 and the meeting of July 19th. There is, however, no evidence in the record that suggests that such a meeting occurred, and Grant did not introduce any testimony before the circuit court to support her contentions. . . .

It could have happened as Grant suggests. More likely, however, the staff prepared a draft opinion and showed it separately to individual members of the District Council before the July 19 meeting. If that's what happened, a quorum never met, no public business was conducted, and the Open Meetings Act was not triggered. But even if this were not so, we would not, in the absence any evidence to the contrary, presume noncompliance by the District Council. Instead, Maryland law presumes that public officials act in compliance with the law. *Anne Arundel v. Halle Dev., Inc.*, 408 Md. 539. 565 (2009). We hold therefore, that Grant has failed to prove any violation of the Open Meetings Act.

*Grant* at * 7.

*Analysis of Grant's Open Meetings Act Claims*

Grant is not alleging that the District Council violated the Open Meetings Act at either the July 18 or July 19 meetings—rather, she alleges that the District Council violated the Open Meetings Act during the intervening time span between the District Council's July 18 and July 19 meetings. As noted *supra*, under the Open Meetings Act, the public body is presumed to have acted in accordance with the Act, and the burden is on Grant to prove a violation. GP § 3-401(c).

Grant has not produced any evidence to support her position that the District Council violated the Open Meetings Act. Rather, she asks the Court to infer a violation of the Open Meetings Act given the short time span between the District Council's consideration of the oral arguments on July 18, and the Council's vote to approve a fifty-one page decision the

29

following day. Grant contends that the Court of Special Appeals' hypothesis assumes that Mr. Kumar was able to write the fifty-one page District Council decision and meet with each District Council member during the night hours after the conclusion of the July 18 hearing and before the Council reconvened on July 19, which Grant contends is unrealistic.

Whether a public body violates the Open Meetings Act depends upon the specific facts presented. For the reasons set forth herein, we decline to find a violation of the Open Meetings Act where Grant presented no direct and culpable facts to support such a claim, particularly given her burden to prove a violation, and in the face of the statutory presumption that the District Council complied with the Act.

Contrary to Grant's speculation that the District Council must have violated the Open Meetings Act given the short time span between the District Council's tentative vote and its final approval of its decision, there are several indicators that nothing ran afoul of the Open Meetings Act.

The written decision of the ZHE was transmitted to the District Council and was hand-delivered to Mr. Kumar on May 13, 2016—over two months before the District Council hearing. On June 13, the District Council, sua sponte by unanimous vote elected to make the final decision in the special exception and variance matter. On June 15, the Clerk of the District Council sent notices to all persons of record that oral argument would be held on July 18. Over one month prior to the hearing, all of the District Council members, the parties and their counsel had knowledge that the matter would be decided by the District Council and the date of the oral arguments.

30

On July 6, Grant's counsel filed a forty-seven page response in opposition to Wal-Mart's exceptions, which included a thirty-one page document titled "Proposed Findings of Fact and Conclusions of Law" ("Grant's Findings of Fact"). Grant's Findings of Fact were also served on Mr. Kumar. Just as counsel for Grant undertook preparation for the July 18 hearing several weeks in advance of the hearing—including preparing and submitting Grant's Findings of Fact, Mr. Kumar also commenced his preparation, which also included drafting proposed Findings of Fact for his client to consider.[22]

The record is also clear that over a month prior to the July 18 hearing, the District Council met and voted to proceed on the voluminous record presented to the ZHE and make the final decision in this case after the parties' arguments. Based upon the questions posed by members of the District Council at the July 18 hearing, it is clear that the individual District Council members had familiarized themselves with the contents of the record prior to the hearing. To summarize, the members already had the entire record of the proceeding before the ZHE as well as the detailed written positions of both Wal-Mart and the opposition.

---

[22]At oral argument, Mr. Kumar confirmed that he had prepared a **draft** Findings of Fact in advance of the July 18 hearing. He noted that there are occasions in contested matters where he may prepare alternative draft Findings of Fact because of uncertainty as to how his client will vote until the actual meeting. As set forth *infra*, while there may be circumstances where members of a public body might trigger the Open Meetings Act by transacting business by email or other means of simultaneous exchanges of communication thereby creating a quorum, the record in this case is devoid of any such conduct here. Our holding in this case is based upon the lack of any evidence in the record of any meetings or discussions during the time period between July 18 and 19 and should not be construed as endorsing or upholding any practice by a public body in which there is an intent to circumvent the Open Meetings Act by some evasive technique.

At the July 18 hearing, eight members of the District Council were present.[23]  After the hearing was convened and called to order, the Chairman of the District Council gave an overview of Wal-Mart's special exception and variance application to expand its existing store.  The Chairman described the current site and details such as the existing square footage of the store, and the proposed square footage of the proposed expansion.  He described the procedural history of the application and noted that the District Council was present to consider oral arguments on the application.

After concluding his opening remarks, Derrick Leon Davis, the Chairman of the District Council ("the Chairman") turned the hearing over to staff to present an overview of the application.[24]  After the staff presentation, the District Council members heard extensive arguments from counsel for Wal-Mart and counsel for Grant, including a summary of the evidence to support their respective positions.  The District Council also entertained public comment from one member of the public who spoke in favor of the Wal-Mart application.  Both counsel for Wal-Mart as well as counsel for Grant referred to specific exhibits in the voluminous record.  The transcript of the meeting reflects that

---

[23]Although the title page of the July 18 transcript reflects that nine District Council members were present, including Councilmember Lehman, the record reflects that only eight members were present and voted eight to zero to reverse the ZHE and have staff prepare a document of approval with conditions.  At the July 19 meeting, Ms. Lehman confirmed that she had not been in attendance on July 18.

[24] Jimi Jones of MNCPPC's Development Review Division provided the District Council and other participants with an overview of the special exception application.  In addition, Stan Brown, People's Zoning Counsel, gave a brief overview and "spoke to the legalities of the argument presented."

32

members of the District Council asked questions and were engaged. There were several discussions between District Council members concerning exhibits and evidence from the ZHE's hearing which were displayed on a projector. District Council members asked questions pertaining to setbacks, buffers and fencing, truck patterns, stormwater, road frontage, building orientation, the size of the site, and the proposed architecture. The record reflects discussion and participation by counsel for Wal-Mart and Grant, as well as planning staff.

At the conclusion of the hearing, District Member Franklin summarized his position on the application and made a motion "to direct Staff to prepare an Order reversing the decision of the ZHE and prescribing approval with conditions." The motion was seconded and the clerk called the roll. Each of the eight District Council members in attendance voted affirmatively.

Based upon the record, it is highly plausible that Mr. Kumar polished and finalized a draft of the proposed Findings of Fact which had been prepared in anticipation of his client's vote. There is no evidence in the record that Mr. Kumar met with the District Council in a meeting with a quorum present during the intervening period between the two public meetings, nor can we or will we speculate that any such meeting occurred in the absence of any such evidence.

Grant also asks us to embrace that the hypothesis in the opinion of the Court of Special Appeals that Mr. Kumar may have shown his draft Findings of Fact separately to individual members of the District Council during the time period between the two public meetings and that this violates the Open Meetings Act. Specifically, Grant urges us to

33

follow some decisions from a few other states finding violations of their respective open meetings laws under a "walking quorum" theory.[25]

Relevant to the establishment of a "walking quorum," the issue of email communications, separately held telephone calls, or other modes of communication between members of a public body outside of a physical meeting of a quorum of the members has been the subject of both Attorney General Opinions and Compliance Board Opinions. While Attorney General Opinions are entitled to consideration they are not binding on this Court.[26] *City of Balt. Dev. Corp. v. Carmel Realty Assoc.,* 395 Md. 299, 327 (2006).

---

[25]Some states have used the term "walking quorum" to describe a public body's use of the quorum requirement to avoid deliberating in public. *See eg. Asgeirsson v. Abbott*, 773 F. Supp. 2d 684, 706 (W.D. Tex. 2011), aff'd, 696 F.3d 454 (5th Cir. 2012) (walking quorums "occur when members of a governmental body gather in numbers that do not physically constitute a quorum at any one time but who, through successive gatherings, secretly discuss a public matter with a quorum of that body" (citations and some internal punctuation omitted)); *Mabry v. Union Parish Sch. Bd.,* 974 So. 2d 787, 789 (La. App. 2 Cir. 2008) (a "walking quorum" is "a meeting of the public body where different members leave the meeting and different members enter the meeting so that while an actual quorum is never physically present an actual quorum during the course of the meeting participates in the discussion."). Each state has its own unique Open Meetings Act statute. For example, the Texas Open Meetings Act (Tx. Gov't § 551.143) contains a provision titled "Conspiracy to Circumvent Chapter", which makes it a misdemeanor for a "member or group of members knowingly to conspire to circumvent [the Texas Open Meetings Act] by meeting in numbers less than a quorum for the public of secret deliberations in violation of this chapter." The Maryland statute has no similar provision. Again, whether a public body has violated the Open Meetings Act is a fact-specific inquiry. Here, there are no facts in the record to support such a determination.

[26] In addition, Compliance Board Opinions are advisory and have no binding authority on this Court.

The Attorney General's Office provides advice to public bodies about open meetings compliance and has prepared the Open Meetings Act Manual which offers practical guidance on the Act. The Attorney General's Office has summarized the difficulty of analyzing these issues of communication between members as follows:

> The presence of a quorum for purposes of the Act gets murky when the members are not simultaneously in one place or on one conference call but nonetheless seem able to discuss public business as a group. The Compliance Board has often addressed complaints that a public body reached a decision through emails, separately-held phone calls, or other modes of communication outside of a meeting of a quorum of the members. Usually, the Act's definition of a "meeting" to require the presence of a quorum has meant that the Act does not apply to sequential or written communications among the members. . . .

> The Compliance Board has also cautioned that courts might look beyond the quorum requirement to determine whether, as a practical matter, a quorum of the public body was in on the discussion. In 8 *OMCB Opinions 56* (2012), a county board heard a land use appeal in an open session, announced that it would take the matter under advisement, and then, at a subsequent open meeting, adopted without discussion a written statement of its findings and conclusions. The board's counsel explained that, as was the custom, he had not discussed the document as a group. On those facts, the Compliance Board stated that 'no meeting' had occurred—but it also advised the public body of the risks of such practices:

>> We are reluctant . . . to give the impression that the quorum requirement provides public bodies with an absolute defense to an alleged Open Meetings Act violation. In fact, a public body risks violating the Act by manipulating a quorum to avoid the Act's mandates. The Court of Appeals addressed such a violation in [*C.L.U.B. v. Balt. City Bd. of Elections*, 377 Md. 183 (2003)]. There, the City Council President closed a meeting without a vote after she ascertained that a quorum of the councilmembers was not present. *Id.* at 190-91. The Court held that the Council had violated the Act, and, further, that it had done so willfully. *Id.* at 196-97. The *C.L.U.B.* Court thus concluded that a public body, acting willfully to evade the Act, may be subject to the Act even in the absence of an actual quorum. *Id.* at 59.

35

Open Meetings Act Manual, 1-8-1-9.

Concerning the issue of electronic communications, the Office of the Attorney General has summarized the issue as follows:

> Questions arise as to whether the exchange of electronic communications among a quorum means that a quorum is present. This Office opined in 1996 that sequential e-mail communications, which it then analogized to the exchange of information through regular mail, are not subject to the Act. *See* 81 Op. Att'y Gen. 140, 142 (1996). That conclusion, reached before the development of most forms of social media and easy texting, should not be construed to apply automatically to all forms of electronic communication or even to all email communications. In fact, the opinion states that the 'result would be different' if the members were able to 'use email for 'real time' simultaneous interchange.' *Id.* at 143-44. Under the functional approach taken by the Court in *C.L.U.B.*, an online discussion in which a quorum of the public body participates on a near-simultaneous basis might well be deemed to meet this element of the 'meeting' test.

Open Meetings Act Manual, 1-10.

We do not condone the use of a "walking quorum" or other device if used to evade the requirements of the Open Meetings Act and shield the actual deliberations of a public body from public view. However, as noted *supra*, whether a public body violated the Open Meetings Act is a fact-specific inquiry which depends upon, among other things, whether a quorum of the public body met in some fashion. There may be instances where the Court may find a violation of the Open Meetings Act in the absence of a physical meeting consisting of a quorum of a public body. *See C.L.U.B.*, 377 Md. 183. We decline to make such a holding here where the record lacks evidence of any actual meeting or any exchange of emails or other communications between members of the District Council which might

rise to the level of a "meeting" or any evasive device purposefully designed to avoid the requirements of the Act.

There is no evidence in the record upon which we can evaluate the communications, if any, between Mr. Kumar and members of the District Council, or among the District Council members, in order to make a determination that the District Council violated the provisions of the Open Meetings Act. Accordingly, we hold that Grant has failed to prove that the District Council violated the Open Meetings Act in this case.

## C. The District Council Exercises Original Jurisdiction in Reviewing Special Exceptions and Variances Heard Before the ZHE.

We now consider the type of jurisdiction the District Council possesses when it considers special exception and variances heard by the ZHE. Grant contends that the District Council's jurisdiction is merely appellate. In contrast, the District Council and Wal-Mart argue that the District Council exercises original jurisdiction. The importance of this distinction lies in the District Council's ability to engage in independent fact finding. If the District Council only has appellate jurisdiction, then it is unable to make its own findings of fact and would be limited to those found by the ZHE. On the other hand, if the District Council maintains original jurisdiction over special exception and variance cases, then the District Council is permitted to engage in its own fact-finding.

*Relevant Provisions of the RDA and PGCC*

Under the RDA, the District Council is granted extensive authority to establish zoning laws and procedures under which special exception and variance cases are held. LU § 22-301(a)(1) ("A district council may adopt zoning laws that authorize the board of

37

appeals, the district council, or an administrative office or agency designated by the district council to grant special exceptions and variances to the zoning laws on conditions that are necessary to carry out the purposes of this division."). The RDA also empowers the District Council to establish procedures for "appeal[s] from an administrative agency" created under Subtitle 27 of the RDA. LU § 22-301(a)(1).

Based on these grants of authority under the RDA, the District Council has enacted several provisions of the PGCC that support the District Council's position that when it reviews special exception and variance applications it exercises original jurisdiction. First, the District Council created the ZHE in 1971. Prince George's County Council, Bill No. 1-1971. Second, under PGCC § 27-132(f)(1), the District Council exercises original jurisdiction over special exception and variance cases originating before the ZHE ("[i]n deciding an appeal to the District Council, or Council election to review a decision made by the Zoning Hearing Examiner or the Planning Board, the Council shall exercise original jurisdiction.").

Third, the PGCC empowers the District Council to grant special exceptions and variances. PGCC § 27-316. *See also* PGCC § 27-314 (empowering the District Council to approve special exceptions). In addition, the District Council possesses the ability to remand a special exception case to the ZHE for a de novo proceeding where good cause is demonstrated. PGCC § 27-133(a)(1). Under the framework established by the District Council, a decision by the ZHE becomes final thirty days after filing unless a party elects to have the decision reviewed by the District Council or the District Council, sua sponte

38

by majority vote, elects to make the final decision. PGCC § 27-312(a)(2)(C). We now turn in our analysis to precedent about the District Council's jurisdiction.

*Zimmer, Billings, and Their Applicability*

The parties extensively debate the applicability of several decisions by this Court to support their respective arguments. First, we held in *Cty. Council of Prince George's Cty. v. Billings*, that the District Council was not permitted to "withdraw" its election to review a special exception under PGCC. 420 Md. 84, 107 (2011). The District Council and Wal-Mart characterize *Billings* as an affirmance that, under the PGCC, the District Council exercises original jurisdiction: "After electing to review a decision by the ZHE, the ZHE's decision is no longer final. Instead, the Council's decision becomes the final decision." 420 Md. at 106 n. 14.[27] In contrast, Grant contends that any references to the nature of the jurisdiction the District Council maintains over such proceedings is dicta because the Court was not deciding whether the District Council had appellate or original jurisdiction. In that case, we summarized the District Council's contentions concerning its ability to withdraw a special exception after electing to review it and concluded that the District Council was not empowered under the PGCC to withdraw its election. *Id.* at 84. We commented,

> The Council argues, instead, that it can, without any written findings or conclusions, withdraw its election to review, making the prior agency decision the "final" decision. This withdrawal is conspicuously absent from the statutory options available to the Council. The statute allows the Council, after electing to review an agency decision, to (1) approve it, (2) approve it with conditions, (3) remand it, or (4) deny it. See Section 27–132(f). The Council does not have a fifth option to "decide not to review it, making the

---

[27] The debate concerning the applicability of our holding in *Billings* in terms of the jurisdictional issue is primarily fueled by the Court of Special Appeals' reliance on that decision.

agency decision final." Instead, the Council's "withdrawal of an election to review" is, in effect, an approval of the lower agency decisions in full, without any written findings of fact or conclusions that the law requires. This is not an option given to the Council under the statute.

*Billings*, 420 Md. at 106–07. Although Grant is correct to some extent that the nature of the District Council's jurisdiction was not before the *Billings* Court, the Court's discussion concerning the District Council's original jurisdiction and the requirement that the District Council make the "final decision" in cases involving special exceptions and variances all rely on portions of the PGCC. *See Billings*, 420 Md. at 106 (citing PGCC §§ 27-132, 27-141). Moreover, these comments represent this Court's recognition that the District Council exercises original jurisdiction over special exception and variance applications pursuant to certain provisions of the PGCC.

After *Billings*, we considered the nature of and limits to the District Council's jurisdiction in cases originating from the Planning Board as opposed to the ZHE. *See Zimmer*, 444 Md. at 567-68. In that case, we were asked to determine whether the District Council improperly reversed a decision of the Planning Board and to ascertain whether any limitations apply to the District Council's ability to review certain decisions by the Planning Board. *Zimmer*, 444 Md. at 572.

In *Zimmer*, we held that the District Council could not bestow upon itself original jurisdiction over comprehensive design plans ("CDPs") or specific design plans ("SDPs") because the RDA granted to the Planning Board exclusive jurisdiction over such matters. *Zimmer*, 444 Md. at 570-71. Grant argues that *Zimmer* stands for the proposition that PGCC § 27-132(f)(1) is alone insufficient to answer the question of whether the District

Council has original jurisdiction. *See* PGCC § 27-132(f)(1) ("[i]n deciding an appeal to the District Council, or Council election to review a decision made by the [ZHE] or the Planning Board, the Council shall exercise original jurisdiction."). Instead, she contends that we must look to the RDA to ascertain whether the act permits the District Council's exercise of original jurisdiction in such cases.

The *Zimmer* Court invalidated the portion of PGCC § 27-132(f)(1) that attempted to provide the District Council with the authority to engage in de novo review of CDP and SDP decisions made by the Planning Board. *Zimmer*, 444 Md. at 578-580. The Court illustrated how the RDA grants some powers within certain spheres to the Planning Board and not to the District Council thus cabining the scope of the PGCC § 27-132(f)(1). We explained that, of the powers granted to the Planning Board by the RDA, "LU § 20-202(b)(i) provides that the county planning boards have 'exclusive jurisdiction' over 'local functions,' but does not detail each of these local functions within each jurisdiction." *Id.* at 567. As such,

> [t]he RDA makes particular provision for the local functions that the Legislature did not intend to be within the planning boards' exclusive jurisdiction. LU § 20–503(c) authorizes the District Council to refer for advice only some or all building permits to the Maryland–National Capital Park & Planning Commission for review and recommendation as to zoning compliance. LU § 22–208 requires referral to the county planning boards of applications for zoning map amendments for a "recommendation." Although unclear on its face as to the standard of review, LU § 25–210 authorizes, in Prince George's County, the District Council to "review" the "final decision" of the Planning Board, and issue a "final decision."]

*Id.* at 569.

The Court then outlined the limits of the District Council's review, with respect to planning functions:

> CDP and SDP approvals were not among the local functions that the Legislature excepted from the planning boards' exclusive jurisdiction. Because no alternative provision was made, the RDA indicates to us that, **like other unspecified local planning functions, the Planning Board is invested with exclusive original jurisdiction over the determination of CDPs and SDPs, subject to appellate review by the District Council.**
>
> For the authority of the Planning Board to be "exclusive" or "original" with respect to the CDP and SDP approval processes, the Planning Board must be the de novo decision-maker regarding the merits of a CDP or an SDP. The District Council, if allowed to decide de novo whether a CDP or an SDP should be approved, violates the division of authority established by the RDA. A provision of the county ordinance, such as PGCC § 27–132(f), that purports to give the District Council (or any other body) the authority to decide, de novo, a local function related to planning, zoning, subdivision, or the assignment of street names and house numbers, is invalid. **The District Council may not arrogate to itself original jurisdiction where the RDA places that responsibility elsewhere**. Only the General Assembly, through amendment of the RDA, may accomplish that objective.

*Id.* at 569-70 (emphasis added). In other words, the RDA grants to the Planning Board exclusive jurisdiction over planning functions, notwithstanding any areas in which the legislature has crafted an exception.[28] *Id.* at 567. This Court has previously recognized that "it is well established in Maryland that zoning and planning are separate functions." *Zimmer*, 444 Md. at 505 (citing *Appleton Reg'l Cmty. Alliance v. Cty. Comm'rs of Cecil*

---

[28] In addition to the limitations on the District Council's jurisdiction in its review of the Planning Board's decision in CDPs and SDPs, the Court of Special Appeals has also held that the District Council exercises appellate jurisdiction over Planning Board decisions concerning nonconforming use applications based on the same provision of the RDA. *See Cty. Council of Prince George's Cty. v. Convenience & Dollar Market/Eagle Mgmt. Co.*, 238 Md. App. 613, 636-39 (2018).

*Cty.*, 404 Md. 92, 102 (2008)).[29]  Accordingly, Grant argues based on *Zimmer* that the grant

of original jurisdiction in PGCC § 27-132(f)(1) to the District Council is unlawful unless

the RDA specifically authorizes it.  However, our precedent reveals that this grant of

original jurisdiction over special exception and variance applications stands as permissible

unless the RDA vests exclusive jurisdiction over such cases to another entity.

Although the RDA reserved exclusive jurisdiction to the Planning Board in the

certain respects mentioned above, the same cannot be said regarding the District Council's

jurisdiction over proceedings concerning zoning and specifically special exception and

variance applications.  The RDA empowers the District Council to perform certain actions

including: "adopt[ing] and amend[ing] the text of the zoning law for that county; and . . .

adopt[ing] and amend[ing] any map accompanying the text of the zoning law for that

county."  LU § 22-104(a).  No RDA provision comparable to that mentioned in *Zimmer*

exists with respect to the ZHE which would limit the District Council's jurisdiction in

zoning cases.  Unlike the Planning Board in cases involving SDPs and CDPs, the ZHE

does not maintain exclusive jurisdiction in zoning cases, a sphere that would encompass

special exception and variance applications.  Therefore, neither *Billings* nor *Zimmer* held

---

[29] The *Zimmer* Court explained the differences between zoning and planning: "Zoning is the more finite term. . . . used to describe the process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses designed in some degree to serve the interests of the whole territory affected by the plan." *Zimmer*, 444 Md. at 505 (citations and internal quotation marks omitted).  Whereas, "[p]lanning is the broader term. . . . concern[ing] the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments, and such other matters affecting the public convenience[.]"  *Id.* (citations and internal quotation marks omitted).

or indicate that the District Council does not have original jurisdiction over special exception and variance cases. To the contrary, the RDA granted wide-ranging authority to the District Council to regulate zoning within the County. Based on this grant of authority, the District Council has adopted provisions within the PGCC that specify its original jurisdiction over special exception and variance applications and establish the accompanying procedure.

*Procedural Features*

Lastly, Grant argues that some features of special exception and variance proceedings, mainly originating from the PGCC, are inconsistent with the position that the District Council exercises original jurisdiction. For example, Grant contends that certain provisions suggest that the ZHE has original jurisdiction and the District Council's jurisdiction is only appellate because the underlying procedure demonstrates the hallmarks of an appellate system. In response, the District Council maintains that despite these provisions the District Council clearly exercises original jurisdiction under the PGCC. Therefore, we must examine the provisions concerning the District Council's review of special exception and variance cases to ascertain the form of jurisdiction it exercises over such cases.

As mentioned above, a special exception or variance decision by the ZHE becomes final thirty days after its filing, unless a party files exceptions to have the District Council review its decision or the District Council, sua sponte by majority vote, elects to make the final decision. PGCC § 27-312(a)(2). Grant substantially relies on a section of the above provision which seemingly characterizes the District Council's review of a ZHE decision

44

as an appeal. *See* PGCC § 27-312 (permitting the parties to "timely appeal" a decision of the ZHE to the District Council). Under the RDA the District Council is required to "provide for the appeal of decisions of the zoning hearing examiner in special exception cases to the district council." LU § 22-310.

Within the procedural realm, the ZHE makes findings of fact and conclusions of law. PGCC § 27-127(c). In cases where the District Council reviews a decision of the ZHE, "the [ZHE] shall transmit specific findings of fact, conclusions of law, and a recommended disposition of the case to the District Council for final decision[.]" PGCC § 27-312(a)(2)(B). The PGCC also grants the ZHE the power to issue subpoenas and swear witnesses. PGCC § 27-127(b). The District Council generally conducts oral argument based on a record established in the proceedings below. *Convenience & Dollar Market/Eagle Mgmt. Co.*, 238 Md. App. at 626. Indeed, the record considered by the District Council is limited. *See* PGCC § 27-131(f)(1) (indicating that "[p]ersons of record may not introduce evidence not already in the record."). In addition, the District Council is permitted to "remand" decisions of the ZHE to "receive and evaluate additional evidence[.]" PGCC § 27-131(f)(1). In a proceeding before the District Council, parties are each limited to thirty minutes of oral argument. PGCC § 27-131(e)(1).

We ultimately find Grant's arguments on this point unpersuasive. First, the RDA bestows upon the District Council wide-ranging authority to establish zoning laws, the creation of administrative offices to hear such cases, and to make laws codifying the accompanying procedure. We reiterate that, based on this grant of authority, the District Council has established that it exercises original jurisdiction over special exception and

variance cases. PGCC § 27-132. This situation is dissimilar from *Zimmer* because, in this case, no provision within the RDA grants exclusive jurisdiction to the ZHE within the sphere of zoning.[30] Considering that the District Council created the ZHE in 1971 pursuant to the grant of authority under the RDA to establish administrative offices to administer zoning laws, this fact supports our ultimate conclusion that the District Council exercises original jurisdiction over special exception and variance cases. *See* Prince George's County Council, Bill No. 1-1971. *See also* LU § 22-104(a). Although a provision under the RDA and certain provisions of the PGCC use the generic term "appeal" to denote the District Council's review of decisions by the ZHE, we find these mentions insufficient to constrain the District Council's jurisdiction to appellate. Put simply, the use of the term "appeal" within the relevant provisions only denotes a secondary level of review by the District Council. Despite the semantic choice, the RDA clearly empowers the District Council to enact provisions to establish the type of jurisdiction it exercises over special exception and variance applications.

We also do not find persuasive Grant's contentions that the District Council exercises only appellate jurisdiction over special exception and variance applications simply because the underlying procedure resembles an appellate system. There are numerous instances in which Maryland courts exercise original jurisdiction, yet their decisions are based on preliminary fact-finding and recommendations of lower courts or

---

[30] As mentioned above, the *Zimmer* Court held that the District Council did not hold original jurisdiction over cases from the Planning Board, i.e. CDPs and SDPs decisions, because the RDA specifically vested original jurisdiction over these types of cases to the Planning Board. *Zimmer*, 444 Md. at 582-83.

46

entities. First, as identified by the Court of Special Appeals, circuit courts often delegate matters to magistrates to conduct fact-finding and to make recommendations. Md. Rule 9-208. Despite this, a circuit court still maintains original jurisdiction over the matter and this does not provide the magistrate with original jurisdiction. *See Harryman v. State*, 359 Md. 492, 505 (2000) ("a master's status as an 'officer of the court' does not confer judicial powers upon the master . . . . a master is a ministerial officer who advises and assists a judge." (citations omitted)). *See also O'Brien v. O'Brien*, 367 Md. 547, 554-555 (2002) (explaining that a master or magistrate's report is merely advisory and their conclusions are "merely recommendatory and must be reviewed by the court with an independent exercise of judgment." (internal quotation marks omitted)).

Second, as also recognized by the Court of Special Appeals, this Court has original jurisdiction in legislative redistricting cases. *See* Md. Const. art III, § 5; *In re Legislative Districting*, 436 Md. 121 (2012); *In re Legislative Districting of State*, 370 Md. 312, 326 (2002). In such cases, however, we appoint a "Special Master,"[31] responsible for conducting hearings, receiving evidence, hearing oral argument, establishing findings of fact, and making conclusions of law. *See In re Legislative Districting*, 436 Md. 121, 129 (2013); *In re Legislative Districting of State*, 370 Md. 312, 326 (2002); *Legislative*

---

[31] The Special Master appointed in legislative districting cases is most commonly a retired member of this Court or, less frequently, a retired member of our intermediate appellate court. *See In re Legislative Districting of State*, 370 Md. at 337; *Legislative Redistricting Cases*, 331 Md. at 584; *Matter of Legislative Districting of State*, 299 Md. at 668 (appointing a retired judge of the Court of Special Appeals as special master).

47

*Redistricting Cases*, 331 Md. 574, 584 (1993); *Matter of Legislative Districting of State*, 299 Md. 658, 668 (1984).

Legislative districting cases are not the only example of situations in which this Court exercises original jurisdiction, yet requires hearings, fact-finding, and legal conclusions to be prepared by a judge below. We have repeatedly stated that "[t]his [C]ourt has original and complete jurisdiction over attorney disciplinary proceedings." *Attorney Grievance Comm'n v Tayback*, 378 Md. 578, 585 (2003). *See also* Committee Note, Md. Rule 19-725 (indicating that attorney discipline proceedings "are conducted pursuant to the original jurisdiction of the Court of Appeals"). Similar to the posture of legislative redistricting cases, this Court designates a judge responsible for holding a hearing, receiving evidence, hearing oral argument, and making findings of fact and conclusions of law. *See* Md. Rule 19-722(a). *See generally* Md. Rule 19-727. Despite this procedure, this Court still retains original jurisdiction over attorney discipline proceedings and makes the final decision on factual findings, conclusions of law, and sanctions, if any, in such cases.

As demonstrated, simply because a lower court, master, or administrative agency is assigned to hold hearings, receive evidence, hear oral argument, and make findings of fact and conclusions of law, it does not follow that the lower court, master, or administrative entity maintains original jurisdiction over such proceedings. Accordingly, we find Grant's arguments on this point unavailing.

Therefore, the RDA provides the District Council with wide-ranging authority to establish and amend zoning laws within the county in which it operates. Through this grant

48

of authority, the District Council established the ZHE, the procedures associated with its review, and that it has original jurisdiction over special exception and variance cases arising from the ZHE.

## CONCLUSION

In conclusion, we first hold that the District Council's delegation to its staff attorney to prepare a proposed opinion, order, and findings of fact for Council's subsequent consideration and approval was permitted under the PGCC and not prohibited under the RDA. Second, we conclude that the District Council did not violate the Open Meetings Act. Grant failed to present sufficient evidence that any violation of the Open Meetings Act occurred and was unable to overcome the statutory presumption that the District Council complied with the Act. Third, we hold that the District Council exercises original jurisdiction when it reviews special exception and variance applications from the ZHE. In short, the RDA grants unto the District Council extensive authority to regulate and establish zoning laws and procedure, which specifically includes special exception and variance applications. Based on this authority, the District Council may exercise original jurisdiction under PGCC § 27-132(f)(1). Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

49